Thomas RICCI, Plaintiff-Appellant,

v.

**CHICAGO MERCANTILE EXCHANGE,**
an Illinois not-for-profit corporation,
et al., Defendants-Appellees.

No. 18222.

United States Court of Appeals,
Seventh Circuit.

June 17, 1971.

Kerner, Circuit Judge, concurred in part and dissented in part and filed opinion.

Jerome H. Torshen, Fred J. Ginsburg, Harry H. Fortes, Lawrence H. Eiger, Chicago, Ill., for plaintiff-appellant.

Lee A. Freeman and Jerrold E. Salzman, Chicago, Ill., for defendant-appellee Chicago Mercantile Exchange.

Max Chill, Charles B. Bernstein, Chicago, Ill., for defendants-appellees Joseph E. Siegel and The Siegel Trading Co., Inc.; Herman Chill, Chicago, Ill., of counsel.

Before HASTINGS, Senior Circuit Judge, and KILEY and KERNER, Circuit Judges.

HASTINGS, Senior Circuit Judge.

Plaintiff Ricci brought this action under sections 4 and 16 of the Clayton Act, Title 15, U.S.C.A. §§ 15 [1] and 26,[2] seeking injunctive relief and treble damages. The complaint charged defendants Chicago Mercantile Exchange, its president, Everette B. Harris, its vice-president, William Phelan, its board chairman, Leo Melamed, and Siegel Trading Company and its president, Joseph Siegel with violations of section 1 of the Sherman Act, Title 15, U.S.C.A. § 1 [3] and tortious interference with commercial relationships. Siegel Trading Company and Siegel [4] moved to dismiss the complaint for failure to state a claim upon which relief could be granted and for want of jurisdiction. In a separate motion to dismiss, the Exchange defendants argued the complaint failed to state a cause of action under section 1 of the Sherman Act. From an order granting defendants' motions to dismiss, plaintiff appeals.

Count I of appellant's six-count complaint alleged, in substance, that he purchased a membership in the Chicago Mercantile Exchange and became duly qualified to trade in commodities and commodity futures pursuant to the rules of the Exchange and the Commodities Exchange Authority. On February 11, 1969, Siegel induced the Exchange and its officers to transfer appellant's membership to James F. Reich, without hearing or notice, utilizing a previously revoked blank authorization to transfer membership. Such action was allegedly in violation of the rules and regulations of the Exchange and the Commodity Exchange Act and was done in pursuance of an unlawful conspiracy with the intent and for the purpose of restraining appellant from conducting his lawful

---

1. Title 15, U.S.C.A. § 15 provides:
 "§ 15. Suits by persons injured; amount of recovery
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

2. Title 15, U.S.C.A. § 26 provides, *inter alia*:
 "§ 26. Injunctive relief for private parties; exception
 "Any person * * * shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws * * *."

3. Title 15, U.S.C.A. § 1 provides, *inter alia*:
 "§ 1. Trusts, etc., in restraint of trade illegal; exception of resale price agreements; penalty
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States * * * is declared to be illegal * * *."

4. Siegel Trading Company will be referred to as "Siegel." Likewise, the Chicago Mercantile Exchange and its officers will be referred to as the "Exchange" or the "Exchange defendants."

business.[5] As a result of such transfer, appellant was excluded from trading on the Exchange from February 11, 1969 until March 4, 1969 when he purchased another membership for $45,000.

Counts III and V of the complaint are directed against the Exchange and the individual defendants and reallege the allegations of Count I with respect to violation of the Sherman Act. Counts II, IV and VI charge tortious interference with advantageous commercial relationships and, since all parties are residents of Illinois, will necessarily fall for want of jurisdiction if the Sherman Act allegations are not sustained.

The Exchange defendants claim that the trial court, in ruling on the motions to dismiss, admitted evidence other than that stated in the complaint and thereby converted them into motions for summary judgment. See, Fed.R.Civ.P. 12(b), 56. If this were true, it would allow this court to examine deposition testimony which appellees contend entirely disposes of the case. The short answer is that the transcript of the hearing on the motion to take depositions demonstrates that the court below was considering only the allegations in the complaint when it ruled on the motions to dismiss.

 Since this is an appeal from an order granting Rule 12(b), Fed.R.Civ. P., motions to dismiss, we must accept appellant's foregoing allegations of fact as true. Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 174–175, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Duzynski v. Nosal, 7 Cir., 324 F.2d 924 (1963).

## I

Appellant first contends that, absent any justification to be derived from the Chicago Mercantile Exchange's status as a board of trade and a designated "contract market" under the Commodities Exchange Act, Title 7, U.S.C.A. § 1 et seq., the allegations of the complaint are sufficient to allege a group boycott, a *per se* violation of section 1 of the Sherman Act.

Relying on Scanlon v. Anheuser Busch, Inc., 9 Cir., 388 F.2d 918 (1968), cert. denied, 391 U.S. 916, 88 S.Ct. 1810, 20 L.Ed.2d 654 (1968) and Ace Beer Distributors, Inc. v. Kohn, Inc., 6 Cir., 318 F.2d 283 (1963), cert. denied, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 166 (1963), the Siegel defendants argue that the facts alleged merely amount to the substitution of one competitor for another with no resulting public injury and are, therefore, not within the purview of the antitrust acts.

*Scanlon, supra,* and *Ace Beer, supra,* are inapplicable to the case at bar. Each concerned the cancellation of individual exclusive beer distributing contracts with the immediate substitution of other distributors. The relevant markets were competitive and the courts held that no unreasonable restraint of trade resulted from the refusals to deal since existing competition was not diminished and the cancellation was not an unusual business procedure. See, *Ace Beer, supra* at 287.

Appellant has alleged his exclusion from the Chicago Mercantile Exchange, a monopolistic market, was in violation of its own rules and regulations. Such exclusion is alleged to be a part of a conspiracy to intentionally injure his business. In Gamco, Inc. v. Providence Fruit & Produce Bldg., 1 Cir., 194 F.2d 484 (1952), cert. denied, 344 U.S. 817, 73 S.Ct. 11, 97 L.Ed. 636 (1952), the court was confronted with the exclusion of a trader from a produce building where the sales of fresh fruits and vegetables occurred. The board that managed the building refused to renew the trader's lease after its expiration. The court in

---

5. Plaintiff also alleges that the conspirators attempted to induce a "Clearing Member" of the Exchange to issue an antedated release of its authorization of Ricci to trade to Siegel and that the Exchange knowingly failed to enforce its own rules relating to financial reporting. No specific damage is assigned to these allegations.

finding violations of sections 1 and 2 of the Sherman Act said:

"[T]he latent monopolist must justify the exclusion of a competitor from a market which he controls. Where, as here, a business group understandably susceptible to the temptations of exploiting its natural advantage against competitors prohibits one previously acceptable from hawking his wares beside them any longer at the very moment of his affiliation with a potentially lower priced outsider, they may be called upon for a necessary explanation. The conjunction of power and motive to exclude with an exclusion not immediately and patently justified by reasonable business requirements establishes a prima facie case of the purpose to monopolize." *Id.* at 488.

Accepting, as we must, appellant's allegations as to the reasons and manner in which he was excluded, there is no justification for the actions of the Exchange and the individual defendants. The transfer of his membership in violation of the rules of the Exchange and pursuant to a conspiracy to intentionally injure his business would constitute a group boycott, *per se* actionable under the Sherman Act.

■ The absence of an allegation of public injury is not fatal to the maintenance of an action where a *per se* violation is alleged. Radiant Burners, Inc. v. Peoples Gas, Light and Coke Co., 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Switzer Brothers v. Locklin, 7 Cir., 297 F.2d 39 (1961).

■ Likewise, where the defendants enjoy the power to deny potential competitors access to the market, the absence of competitive change in the relevant market is not fatal to the cause of action. *Gamco, Inc., supra* 194 F.2d at 487.

Finally, this is not a case, as appellees contend, where appellant has used traditional antitrust language to transform an essentially state cause of action into a federal antitrust claim. *Compare*, Norville v. Globe Oil & Refining Co., 7 Cir., 303 F.2d 281 (1962); Parmelee Transportation Company v. Keeshin, 7 Cir., 292 F.2d 794 (1961).

■ In view of the foregoing, we conclude that, absent any justification from the Exchange's status as a board of trade and a designated "contract market," the complaint is sufficient to allege a group boycott, a *per se* violation of section 1 of the Sherman Act.

## II

Relying primarily on Silver v. New York Stock Exchange, 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), appellant asserts that no justification can be derived either from the Commodities Exchange Act or from the Exchange's status as a board of trade for the actions herein alleged. Consequently, he claims a cause of action under section 1 of the Sherman Act has been stated.

In *Silver, supra,* member firms of the New York Stock Exchange were ordered by the Exchange to terminate private telephone and tickertape connections to Silver's over-the-counter brokerage firms. The Court, observing that the concerted cut-off by the Exchange and its members had deprived Silver of an asset important to his ability to compete as a broker-dealer, said that such conduct would have been a *per se* violation of the Sherman Act "absent any justification derived from the policy of another statute or otherwise." *Id.* at 348–349, 83 S.Ct. at 1252. However, because of the existence of the mandate of self-regulation present in the Securities Exchange Act, the Court sought to "reconcile pursuit of the antitrust aim of eliminating restraints on competition with the effective operation of a public policy contemplating that securities exchanges will engage in self-regulation which may well have anticompetitive effects in general and in specific applications." *Id.* at 349, 83 S.Ct. at 1252.

The Court concluded that under the circumstances of the case, it did not

have to complete the accommodation between the acts since the Exchange did not reach the threshold of justification under the statute and had plainly exceeded the scope of its authority to engage in self-regulation by not informing Silver of the charges underlying the decision to terminate the connections and by not providing an appropriate opportunity to explain or refute such charges despite prompt and repeated requests therefor. *Id.* at 361, 365, 83 S.Ct. at 1259, 1261.

Appellant here contends that the Exchange was not justified in excluding him from trading because nothing in the statutory scheme allows the Exchange to discipline brokers by excluding them from trading. Even if there were such statutory authorization, here he was afforded neither hearing nor notice and, thus, he claims the Exchange did not reach the threshold of justification. Assuming these contentions to be true, they do not dispose of this case.

The Chicago Mercantile Exchange is a "contract market" designated by the Secretary of Agriculture to conduct future trading in commodities pursuant to the Commodity Exchange Act, as amended, Title 7, U.S.C.A. § 1, et seq. As a condition of such designation, it must fulfill certain statutory requirements including the enactment and enforcement of bylaws, rules and regulations which relate to "trading requirements" [6] and which provide "minimum financial standards and related reporting requirements" [7] for members of such markets.

Failure to enforce these bylaws, rules and regulations may result in suspension or revocation of the contract market designation [8] as well as cease and desist proceedings with attendant misdemeanor penalties for failure to comply.[9] Anyone who acts singly or in concert with another to bring about a violation of rules and regulations issued pursuant to the Act is liable as a principal for such vio-

6. Title 7, U.S.C.A. § 7a provides, *inter alia*:
 "§ 7a. Duties of contract markets
 Each contract market shall—
 \* \* \* \* \*
 "(8) enforce all bylaws, rules, regulations, and resolutions, made or issued by it or by the governing board thereof or any committee, which relate \* \* \* to other trading requirements, and which have not been disapproved by the Secretary of Agriculture \* \* \*."

7. Title 7, U.S.C.A. § 7a provides, *inter alia*:
 "§ 7a. Duties of contract markets
 Each contract market shall—
 \* \* \* \* \*
 "(9) enforce all bylaws, rules, regulations, and resolutions made or issued by it or by the governing board thereof or by any committee, which provide minimum financial standards and related reporting requirements for \* \* \* members of such contract market \* \* \*."

8. Title 7, U.S.C.A. § 7b provides:
 "§ 7b. Suspension or revocation of designation as 'contract market'
 "The failure or refusal of any board of trade to comply with any of the provisions of this chapter, or any of the rules, regulations, or orders of the Secretary of Agriculture or the commission thereunder, shall be cause for suspending for a period not to exceed six months or revoking the designation of such board of trade as a

'contract market' in accordance with the procedure and subject to the judicial review provided in section 8 of this title."

9. Title 7, U.S.C.A. § 13a provides, *inter alia*:
 "§ 13a. Nonenforcement of rules of government or other violations, cease and desist orders against contract markets; punishment; misdemeanor; separate offenses
 "If any contract market is not enforcing or has not enforced its rules of government made a condition of its designation as set forth in section 7 of this title, or if any contract market, or any director, officer, agent, or employee of any contract market otherwise is violating or has violated any of the provisions of this chapter \* \* \* the commission may, upon notice and hearing and subject to appeal as in other cases provided for in paragraph (a) of section 8 of this title, make and enter an order directing that such contract market, director, officer, agent, or employee shall cease and desist from such violation, [and upon failure or refusal to comply] shall be guilty of a misdemeanor and, upon conviction thereof, shall be fined not less than $500 nor more than $10,000 or imprisoned for not less than six months nor more than one year, or both. \* \* \* \*"

lations and may be subjected to loss of trading privileges on contract markets, as well as cease and desist proceedings with attendant penalties.[10]

The facts alleged by appellant to support his antitrust charge are either violations or induced violations of Exchange rules, promulgated pursuant to the Act, which relate to "trading requirements" and financial reporting requirements.[11] As such, they could have been examined by the Commodity Exchange Commission or the Secretary of Agriculture.[12]

Thus, we are *not* confronted with the problem in *Silver* wherein there was "nothing built into the regulatory scheme which performs the antitrust function of insuring that an exchange will not in some cases apply its rules so as to do injury to competition which cannot be justified as furthering legitimate. self-regulative ends." *Id.* at 358, 83 S.Ct. at 1256. Rather, the maintenance of a private treble-damage suit in the instant case presents the "problem of conflict or coextensiveness of coverage with the agency's regulatory power" not considered in *Silver*. *Id.* at 358, 83 S.Ct. at 1255.

Chief Judge Swygert, in his concurring opinion to Thill Securities Corp. v. New York Stock Exchange, 7 Cir., 433 F.2d 264 (1970), cert. denied, 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 (U.S. Mar. 30, 1971), suggested that the dis-

trict court, on remand, consider this problem of coextensiveness of coverage by determining whether the Securities Exchange Commission possessed primary jurisdiction to judge the New York Stock Exchange's allegedly anticompetitive antirebate rule. *Id.* at 276. The resolution of this issue depended, in part, on the consideration of the following factors: (1) the SEC's power to weigh antitrust policy in fulfilling its duty of review of Exchange self-regulation;. (2) the ability of an aggrieved party to initiate SEC review; (3) the extent that SEC expertise would be useful in resolving the question of whether the antirebate rule was necessary to make the Securities Exchange Act work; and (4) the possibility of achieving the aims of the Sherman Act without subjecting exchanges to treble damage suits. *Id.* at 277.

Applying these criteria to the instant case, we think it appropriate for the invocation of the doctrine of primary jurisdiction. There exists no express or implied exemption in the Commodity Exchange Act that would prevent the Secretary of Agriculture or the Commodity Exchange Commission from taking into account antitrust principles in their deliberations pursuant to the Act. Judge Leventhal, concurring in Cities of Statesville v. AEC, D.C.Cir., 441 F.2d 962

---

10. Title 7, U.S.C.A. § 13c(a) provides:

"§ 13c. Responsibility as principal;
* * *

"(a) Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, * * * or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter * * * may be held responsible in administrative proceedings under this chapter for such violation as a principal."

11. Membership in a contract market is a prerequisite to lawful trading in commod-

ities futures. Title 7, U.S.C.A. § 6. Therefore, Rule 307, allegedly violated in the transfer of appellant's membership, and Rule 322, allegedly violated in the attempt to cancel appellant's authorization to trade, both relate to "trading requirements." The other alleged violation was the failure to enforce financial reporting rules.

12. The Commission has jurisdiction over alleged violations by the Exchange and its officers. It is composed of the Secretary of Agriculture, the Secretary of Commerce and the Attorney General or their respective designees. The Secretary of Agriculture may decide to exclude members of contract markets from trading.

(Slip opinion No. 21,706, Dec. 5, 1969) (*en banc*), observed:

"It is a fair synthesis of the cases [of the Supreme Court and of the D.C. Circuit over the last 25 years] that a statute providing for licensing or other regulation is presumed to permit consideration of antitrust principles, with the harmonizing approach [applied to conflicts between antitrust policies and the agency's other regulatory objectives] * * * unless a contrary intent appears expressly or by necessary implication." (Quotation appears in Hale v. F. C. C., 138 U.S. App.D.C. 125, 425 F.2d 556, 561 (1970) (concurring opinion)).

Appellant could have applied for the institution of proceedings against the defendants before the Commission and/or the Secretary of Agriculture on the facts alleged in this case.[13] He could have thereafter petitioned for intervention in any proceedings initiated pursuant to his application.[14] If indeed the allegedly anticompetitive transfer of membership

were in violation of Exchange rules, the Commission could have prevented it.

Moreover, the questions here involved are precisely the ones that the Commission and the Secretary are to resolve in fulfilling their watchdog function over the Exchange and its members.[15] The allowance of a private treble damage antitrust suit in this case prior to the attempted institution of actions before the Commission or the Secretary would discourage "interested persons" from helping the agency fulfill its regulatory function of insuring that contract markets enforce their own rules and bylaws.

Additionally, there is a potential repugnance between a decision of the Commodity Exchange Commission and the award of treble damages in an antitrust action. The 1968 amendments to the Commodity Exchange Act provide the Commission and the Secretary of Agriculture with the discretion to refuse to report "minor violations" of the Act for prosecution "whenever it appears that the public interest does not require such action." [16] The award of damages that

---

13. Title 17, C.F.R. §§ 0.3 and 0.53 provide that "any interested person having any information of any violation of the act" may file an application requesting the institution of proceedings before the Secretary or the Commission, respectively.

14. Title 17, C.F.R. §§ 0.8, 0.58.

15. In Pan American World Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), the Court dismissed an antitrust action against defendant carriers who had allegedly agreed not to parallel each other's routes. The Civil Aeronautics Board was vested with broad jurisdiction over the air carrier. The Court reasoned at 305, 83 S.Ct. at 482:

"Limitation of routes and divisions of territories and the relation of common carriers to air carriers are basic in this regulatory scheme. The acts charged in this civil suit as antitrust violations are precise ingredients of the Board's authority in granting, qualifying, or denying certificates to air carriers, in modifying, suspending, or revoking them, and in allowing or disallowing affiliations between common carriers and air carriers."

Although the overall regulatory scheme in the instant case is less pervasive than the scheme in *Pan American*, the specific allegations relate directly to the Commission's and the Secretary's power to designate contract markets and allow the trading in futures by individuals. Such power is no less basic to the regulatory scheme than it was in *Pan American*. Also, compare Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576 (1952); United States Nav. Co. v. Cunard S.S. Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932) *with* California v. F. P. C., 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939), for ample illustration of Chief Judge Swygert's observation in *Thill, supra* 433 F.2d at 277, that cases on primary jurisdiction provide no clear resolution to the issue.

16. Title 7, U.S.C.A. § 13c(b) provides:
"§ 13c. * * * minor violations
(b) Nothing in this chapter shall be construed as requiring the Secretary of Agriculture or the commission to report minor violations of this chapter for prosecution, whenever it appears that the public interest does not require such action."

are essentially punitive in nature [17] could conflict with a decision by the Commission in the "public interest" that the punitive steps allowable under the Act should not be taken.[18]

█ We hold, therefore, that before a private treble damage action for antitrust violations may be brought against these defendants charging violation of the rules promulgated as a condition to a contract market designation, the Commodity Exchange Commission and/or the Secretary of Agriculture must have the first opportunity to secure the fulfillment of the statutory duties imposed upon exchanges and their members. The correct remedy in such a case where there is the possibility of a judicial remedy that cannot be granted by the administrative agency is to remand the case to the district court with directions to stay the proceedings until the agency has acted.[19]

Accordingly, we reverse and remand this action to the district court with directions to stay the proceedings until such time as the Commodity Exchange Commission and/or the Secretary of Agriculture may act upon it.

Reversed and remanded with directions.

KERNER, Circuit Judge (concurring in part and dissenting in part).

While I agree that the complaint states a cause of action under the antitrust laws, I do not believe that a remand of this case to the Commission is proper.

Appellant alleges, *inter alia*, that the defendant, Chicago Mercantile Exchange, knowingly conspired with defendant Siegel Trading Company, to prevent him from continuing as a member of the Exchange and, therefore, from transacting his business. Other allegations in the complaint disclose that incidental to proof of appellant's antitrust claim is the proving of a transference of his membership by the Exchange to James E. Reich. Since this transference allegedly would violate Exchange rules, and thereby the Commodity Exchange Act, if not pursuant to a valid authorization, the majority reasons that Ricci must first proceed before either the Secretary of Agriculture or the Commission.

It may be that Ricci could have proceeded before the Commission. However, it does not follow that Ricci *must* proceed before the Commission. The doctrine of primary jurisdiction does not require courts to stay their hand in all controversies which involve factual disputes arguably within the jurisdiction of an administrative agency. Rather, the doctrine holds "that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1952). The underlying factual questions in the case at bar involve neither unconventional facts nor administrative discretion.[1] Whether

17. As was said in Commissioner of Internal Revenue v. Obear-Nester Glass Co., 7 Cir., 217 F.2d 56, 61 (1954), "We might further say that the principal purpose of treble damages seems to be punishment which will deter the violator and others from future illegal acts."

18. We express no opinion on any antitrust immunity that might result from action or inaction taken by the Commission or the Secretary of Agriculture in this case. The complicated issues of reconciliation of the Commodities Exchange Act and the Sherman Act that

would be presented will require the benefit of brief and argument before any determination could be attempted.

19. Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 222–223, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966); Pan American World Airways, Inc. v. United States, *supra* 371 U.S. at 313, n. 19, 83 S.Ct. 476.

1. The Commission does have discretion to refrain from reporting minor violations of its cease and desist orders for prosecution. See discussion *infra*.

Ricci executed a valid authorization binding on him at the time of transfer is a question which a district court is as competent to assess as a commission composed of the Secretary of Agriculture, the Secretary of Commerce and the Attorney General. And, since Congress has made the enforcement of contract market rules mandatory (7 U.S.C. § 7a(9)), no question of administrative discretion could arise.

Thill Securities Corp. v. New York Stock Exchange, 433 F.2d 264 (7th Cir. 1970), cert. denied 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 532 heavily relied upon in the majority opinion, presents a much stronger case for the invocation of primary jurisdiction; yet, two of the judges do not mention the doctrine and the third merely suggests the applicability of the doctrine to the district court.

In *Thill*, a licensed securities dealer brought a class action against the New York Stock Exchange charging an unreasonable restraint of trade and an unlawful monopoly of the securities market in violation of the Sherman Antitrust Act[2] and the Clayton Act.[3] The suit was founded on the Exchange's "anti-rebate rule" which prohibits a member from sharing a commission with a non-member even though the non-member originally received the customer's order. The Exchange contended that the "anti-rebate rule" was within the scope of its authorized self-regulatory powers and that the Securities and Exchange Commission was exercising its statutory power of review which explicitly includes the fixing of reasonable rates of commission.[4] Surely, primary jurisdiction was a more appropriate disposition in *Thill* than it is here. *Thill* was (1) a direct antitrust attack on an Exchange rule (2) which involved unconventional

facts and (3) statutorily declared administrative discretion.

In addition, Judge Pell noted in his separate opinion "that the very matter in issue is now under consideration by the S.E.C. which on May 28, 1968, announced investigation and public hearings on rate structure matters including economic access to the Exchange market by non-member broker-dealers." (*Supra*, at 278.) Despite this aspect, Judge Pell would have remanded to the district court those antitrust questions which related to the alleged Exchange practice of favoring certain non-members. (*Supra*, at 278.) While Judge Pell dissented from that part of the majority opinion in *Thill* which remanded plaintiff's direct challenge of the "anti-rebate rule" to the district court, he did not do so on the basis of primary jurisdiction. Rather, he felt that "the 'fixing or reasonable rates of commission * * * and other charges' as provided for by § 19(b) (9) of the Securities Exchange Act of 1934 (15 U.S.C. § 78s(b) (9)) necessarily includes as an ancillary power the prohibition of rebates." (*Supra*, at 277.) This is a decision on the merits of the "anti-rebate rule" and, therefore, not relevant to the question of where litigants must seek their remedy. Hence, neither Judge Campbell nor Judge Pell, a majority of the panel in *Thill*, reached a result consistent with the result reached by the majority today.[5] In fact, the opinions of Judges Pell and Campbell appear to be clear authority against the majority's disposition of the case at bar.

The criteria enumerated by Chief Judge Swygert in his concurring opinion would dictate a remand to the district court in this case.

(1) The SEC's power to weigh antitrust policy in fulfilling its duty

---

2. Sherman Antitrust Act §§ 1–2, 15 U.S.C. §§ 1–2 (1964).

3. Clayton Act § 4, 15 U.S.C. § 15 (1964).

4. 15 U.S.C. § 78s(b) (9).

5. Evidently, Judge Pell believed the New York Stock Exchange is exempt from

suits which are direct challenges to its rules. Since Judge Pell concurred in that part of Judge Campbell's opinion which remanded the remaining issues to the district court, he must have concluded that primary jurisdiction was inappropriate.

of review of Exchange self-regulation.

I assume the majority opinion intends the Commission (Secretaries of Agriculture and Commerce and the Attorney General) to fully decide the issues in this case. Perhaps the very incongruence of these officials deciding difficult antitrust questions is enough to suggest that Congress did not legislate such a result.[6] However, the resolution of this question need not rest on such grounds. Congress has strictly limited the jurisdiction of the Secretary of Agriculture and the Commission to violations "of the provisions of this chapter." (See e. g., Title 7, U.S.C. § 13a.) This chapter means the "Commodity Exchange Act" (Title 7, U.S.C. § 1) and not the "Sherman Act," which is found at 15 U.S.C. § 1.

Furthermore, there is no provision in the Commodity Exchange Act which suggests that the Commission should regulate these types of competitive factors in contract markets. This is in contrast with SEC statutory authority to review "reasonable rates of commission" which arguably includes such factors. Yet Judge Swygert did not believe that this statutorily granted power of review in the SEC meant, *ipso facto*, that the SEC had the power to consider these factors.[7] Instead, Judge Swygert suggested that the district court consider the question. This careful approach by Judge Swygert is not adopted by the majority although Commission authority to consider antitrust law is, at the least, arguable.

(2) The ability of an aggrieved party to initiate SEC review.

It is reasonably clear that appellant could have applied for the institution of proceedings before the Commission and/or the Secretary of Agriculture and thereafter petitioned for intervention. By regulation, intervention is permitted[8] upon a showing of (a) the petitioner's relationship to the matters involved in the proceeding; (b) the nature of the material he intends to present in evidence; (c) the nature of the argument he intends to make; and (d) any other reason he should be allowed to intervene.

These factors indicate that both the Commission and the Secretary of Agriculture possess the power to exclude claimants based on the nature of their claims. Since institution of proceedings is permitted only when there is reason to believe there has been a violation,[9] Ricci might be prevented from asserting his antitrust action before the Commission. Ricci would then return to the district court on his antitrust claim, needlessly multiplying the number of tribunals involved in these proceedings. Of course, this question could be answered, as it was in *Thill*, by a remand to the district court for the taking of evidence.

(3) The extent that SEC expertise would be useful in resolving the question of whether the antirebate rule was necessary to make the Securities Exchange Act work.[10]

---

6. I merely observe that antitrust law is not within the peculiar province of the Secretaries of Agriculture and Commerce. Of course, quite the opposite is true of the Attorney General who is the chief enforcement officer of the antitrust laws and who could possibly be placed in an inconsistent position in having to judge those suits.

7. "Cases concerning primary jurisdiction of other administrative agencies to consider antitrust matters do not provide clear guidance for resolution of this question. Compare, Pan American World Airlines, Inc v. United States, 371 U.S. 296, 83

S.Ct. 476, 9 L.Ed.2d 325 (1963); California v. F. P. C., 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962)." (Concurring opinion of Chief Judge Swygert at p. 277.)

8. Title 17, C.F.R. §§ 0.8, 0.58.

9. Title 17, C.F.R. §§ 0.3, 0.53. Thus, Ricci may be limited to proof of a Rules violation.

10. This assumes that the Secretary and/or the Commission have the power to consider antitrust claims. Since the question of primary jurisdiction was neither briefed nor argued orally, we are somewhat inhibited in our analysis.

Seemingly, the relevance of this factor is extremely limited in this case. Ricci has alleged and must prove facts which show an unlawful conspiracy between the Exchange and Siegel Trading Company. A good faith but erroneous decision by the Exchange would not be a violation of the Sherman Act. The power to decide membership requirements implies the power to make good faith but erroneous decisions. Such power is needed to make the Exchange Act work. Silver v. N. Y. S. E., 373 U.S. 341, 357, 83 S.Ct. 1246. Since Ricci did not allege that a good faith decision by the Exchange to transfer his membership was a violation of the antitrust laws, the question under (3) is whether it is necessary to make the Act work for the Exchange to possess power to determine its membership if these determinations are motivated by otherwise unlawful intent. This is traditional "rule of reason" inquiry which the Court in *Silver* described as "flexible enough to permit the Exchange sufficient breathing space * * *." *Supra* at 360, 83 S.Ct. at 1259.) Whether the Exchange should be insulated from this type of antitrust liability will be considered in the following section. All that remains to be mentioned here is that a district court would have greater expertise and experience in this regard than the Commission. Judge Campbell so held in *Thill*:

> It is in this area of public protection that the SEC claim their expertise. On the other hand, it should be remembered that the courts of the United States have over the years become the repository of antitrust expertise. (433 F.2d at 273.)

Whatever the validity of this holding with regard to the "anti-rebate rule," it is doubtless true here where the technical complexities do not approach those present in *Thill*.

 (4) The possibility of achieving the aims of the Sherman Act without subjecting exchanges to treble damage suits.

I would think that the aims of the Sherman Act could only be achieved by enforcing that Act against Exchanges which make unlawful transfers of membership for anticompetitive reasons. Perhaps the nature of the action in *Thill* presents a more difficult question; however, I am able to think of no legitimate public policy goals which are advanced by insulating this Exchange from antitrust liability given the conduct alleged in the complaint. The majority opinion indicates none. Yet, the opinion intimates that because of a "potential repugnance between a decision of the Commodity Exchange Commission and the award of treble damages in an antitrust action" (*infra* at p. 11), the aims of the Sherman Act should be subordinated to the aims of the Commodity Exchange Act. This "potential repugnance" stems from Commission discretion to refuse to report minor violations of its cease and desist orders.[11] Apparently the majority would permit the Commission, which does not have jurisdiction to consider the question of damages, to foreclose private suits if such foreclosure were deemed in the public interest.

This reconciliation of the Commodities Exchange Act and the Sherman Act is not consistent with prior Supreme Court decisions on the subject. United States v. Philadelphia National Bank, 374 U.S. 321, 351, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963); United States v. Borden, 308 U.S. 188, 198–200, 60 S.Ct. 182, 84 L.Ed. 181 (1939). Significantly, there is no statutory standard or detailed economic regulation to guide the Commission in making its "public interest" determination. United States v. Philadelphia National Bank, *supra*; California v. Federal Power Com'n, 369 U.S. 482, 484–485, 487–488, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962). In fact, there is no suggestion that the Commission has ever considered, or desires to consider, the economic impact of its decisions. This is not true either of the FPC or the Comptroller of the Currency. United States v. Phila-

11. 7 U.S.C. § 13(b).

delphia National Bank, *supra;* California v. Federal Power Com'n, *supra.* Yet, these bodies do not possess the kind of power the majority would confer on the Commodity Exchange Commission.

Moreover, there is no "potential repugnance" between the Commodity Exchange Act and the Sherman Act. All Congress has done by granting the Commission the aforementioned discretion is to allow the Commission the traditional freedom available to any public prosecutor. It is a cardinal principle of legislative interpretation to construe away from inconsistencies. Here such a construction is not only unstrained, but also the natural meaning to be given the words used. Faced with this situation, a court should not create inconsistencies and then purport to reconcile them.

For the foregoing reasons, I believe the proper disposition of this case is a remand to the district court for further proceedings.