# RICCI *v.* CHICAGO MERCANTILE EXCHANGE ET AL.

No. 71–858. Argued October 18, 1972—Decided January 9, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, BLACKMUN, and REHNQUIST, JJ., joined. BURGER, C. J., filed a concurring opinion, *post*, p. 308. DOUGLAS, J., filed a dissenting opinion, *post*, p. 308. MARSHALL, J., filed a dissenting opinion, in which DOUGLAS, STEWART, and POWELL, JJ., joined, *post*, p. 309.

*Jerome H. Torshen* argued the cause for petitioner. With him on the briefs was *Lawrence H. Eiger*.

*Lee A. Freeman* argued the cause for respondents. With him on the brief for respondents Chicago Mercantile Exchange et al. was *Lee A. Freeman, Jr. Max*

*Chill, Herman Chill,* and *Charles B. Bernstein* filed a brief for respondents Siegel Trading Co., Inc., et al.

*Solicitor General Griswold, Acting Assistant Attorney General Comegys, Samuel Huntington,* and *Seymour H. Dussman* filed a brief for the United States as *amicus curiae* urging reversal.

MR. JUSTICE WHITE delivered the opinion of the Court.

The question before us is whether in this antitrust case the Court of Appeals for the Seventh Circuit properly stayed further judicial action pending administrative proceedings which the court deemed available under the Commodity Exchange Act, 42 Stat. 998, as amended, 7 U. S. C. § 1 *et seq.*

The case began when petitioner Ricci filed a complaint against the Chicago Mercantile Exchange, its president, vice president, and chairman of the board, and against the Siegel Trading Company, a member of the Exchange, and its president, charging a conspiracy in violation of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1. The complaint alleged that Ricci had purchased a membership in the Exchange in 1967, using funds borrowed from the Trading Company, and that in February 1969 the Exchange, at the instance of the Trading Company, transferred the membership to another, without notice and hearing, utilizing a blank transfer authorization that had previously been revoked.[1] Al-

---

[1] Petitioner alleged in his complaint that when he was informed that Siegel Trading Company claimed to be the owner of his membership, he notified the Exchange that he was the owner of the membership; that the Trading Company was indebted to him for $18,000 in brokerage fees which offset the $15,000 he had borrowed to acquire his membership; and that the Trading Company did not have a lien on his membership under the rules of the Exchange. App. 11.

legedly, this course of conduct violated both the rules of the Exchange and the Commodity Exchange Act and was pursuant to an unlawful conspiracy aimed at restraining the conduct of Ricci's business. The result was, the complaint asserted, that Ricci was excluded from trading on the Exchange from February 11, 1969, until March 4, 1969, when he purchased another membership at a considerably higher price than the transferred membership had previously cost.

On motion of respondents, the District Court dismissed the complaint. The Court of Appeals reversed that judgment; but because the challenged conduct was deemed subject to the jurisdiction of the Secretary of Agriculture (Secretary) or the Commodity Exchange Commission (Commission) by virtue of the provisions of the Commodity Exchange Act, the District Court was directed to stay further proceedings to permit administrative action to take place. 447 F. 2d 713 (CA7 1971). We granted certiorari, 405 U. S. 953 (1972), and now affirm the judgment of the Court of Appeals.

I

The Commodity Exchange Act,[2] first passed in 1922 and from time to time amended—the most recent sub-

---

[2] Recognizing the public interest involved in "[t]ransactions in commodity involving the sale thereof for future delivery [futures]" and the burden upon interstate commerce imposed by "sudden or unreasonable fluctuations in . . . prices," 7 U. S. C. § 5, Congress, to regulate "futures" transactions, passed the "Grain Futures Act," 42 Stat. 998, the title being changed to the present "Commodity Exchange Act" in 1936, 49 Stat. 1491. The constitutionality of regulating futures trading under the Commerce Clause, Art. I, § 8, cl. 3, of the Constitution was upheld in *Board of Trade of the City of Chicago* v. *Olsen,* 262 U. S. 1 (1923).

The following will indicate the content and scope of the Act: Trading in futures is to be done only by or through a member of a "contract market," 7 U. S. C. §§ 6 and 6h. The Commodity Exchange Commission (Commission) may take measures to prevent

stantial amendments being in 1968—makes dealing in commodity futures a crime except when undertaken by or through members of a board of trade that meets certain statutory criteria and that is designated as a "contract market" by the Secretary. 7 U. S. C. §§ 6 and 6h.[3] Contract markets must file with the Sec-

excessive speculation, *id.*, § 6a, and certain other transactions are prohibited, *id.*, §§ 6a and 6c. Futures commission merchants and floor brokers must register with the Secretary of Agriculture (Secretary) (a member of the Commission, *id.*, § 2), *id.*, §§ 6d and 6e, and to do so, must meet certain financial requirements, *id.*, § 6f. Customers' money, securities, and property must be handled in a prescribed fashion, *id.*, § 6d, and futures commission merchants and floor brokers must meet reporting and recordkeeping requirements established by the Secretary and keep such books and records open for inspection, *id.*, § 6g. Specified transactions must be reported to the Secretary and books and records of same kept, which shall be subject to inspection, *id.*, § 6i. To be designated a "contract market" a board of trade must meet certain conditions and requirements, *id.*, § 7; and a contract market must perform certain duties, *id.*, § 7a. The contract market can have its designation suspended or revoked, *id.*, §§ 7b and 8, or be subjected to cease-and-desist orders, *id.*, § 13a. For stated reasons persons may be excluded from trading on a contract market by the Secretary, *id.*, § 9, or be subjected to a cease-and-desist order, *id.*, § 13b, and it is unlawful for such persons to trade while banned, *id.*, § 12b. Contract markets are not to exclude from membership cooperative associations or corporations except under certain conditions, *id.*, § 10a. A contract market may have its designation vacated and subsequently be redesignated, *id.*, § 11. The Secretary may make investigations and reports, *id.*, § 12, and may disclose the names of traders on commodity markets, *id.*, § 12–1. Certain acts may be punished as felonies or misdemeanors, *id.*, §§ 13, 13–1, 13a, and 13b. Persons involved in violations of the Act or rules issued thereto may be held responsible as principals, *id.*, § 13c (a). The Secretary or Commission is not required to report minor violations of the Act "for prosecution, whenever it appears that the public interest does not require such action," *id.*, § 13c (b).

[3] Title 7 U. S. C. § 6 provides:

"It shall be unlawful for any person to deliver for transmission through the mails or in interstate commerce by telegraph, telephone, wireless, or other means of communication any offer to make or exe-

retary their bylaws, rules, and regulations, and have the express statutory duty to enforce all such prescriptions (1) "which relate to terms and conditions in

cute, or any confirmation of the execution of, or any quotation or report of the price of, any contract of sale of commodity for future delivery on or subject to the rules of any board of trade in the United States, or for any person to make or execute such contract of sale, which is or may be used for (a) hedging any transaction in interstate commerce in commodity or the products or by-products thereof, or (b) determining the price basis of any such transaction in interstate commerce, or (c) delivering commodity sold, shipped, or received in interstate commerce for the fulfillment thereof, except, in any of the foregoing cases, where such contract is made by or through a member of a board of trade which has been designated by the Secretary of Agriculture as a 'contract market,' as hereinafter provided in this chapter, and if such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery: *Provided,* That each board member shall keep such record for a period of three years from the date thereof, or for a longer period if the Secretary of Agriculture shall so direct, which record shall at all times be open to the inspection of any representative of the United States Department of Agriculture or the United States Department of Justice."

Title 7 U. S. C. § 6h states:

"It shall be unlawful for any person—

"(1) to conduct any office or place of business anywhere in the United States or its territories for the purpose of soliciting or accepting any orders for the purchase or sale of any commodity for future delivery, or for making or offering to make any contracts for the purchase or sale of any commodity for future delivery, or for conducting any dealings in commodities for future delivery, that are or may be used for

"(A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or

"(B) determining the price basis of any such transaction in interstate commerce, or

"(C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof,

"if such orders, contracts, or dealings are executed or consum-

contracts of sale . . . or relate to other trading require-
ments, and which have not been disapproved by the Secre-
tary of Agriculture pursuant to" his statutory authority,
*id.*, § 7a (8),[4] or (2) "which provide minimum financial

mated otherwise than by or through a member of a contract
market; or

"(2) falsely to represent such person to be a member of a con-
tract market, or the representative or agent of such member, or to
be a futures commission merchant registered under this chapter, or
the agent of such registered futures commission merchant, in solicit-
ing or handling any order or contract for the purchase or sale of any
commodity in interstate commerce or for future delivery, or falsely
to represent in connection with the handling of any such order or
contract that the same is to be or has been executed on, or by or
through any member of, any contract market."

[4] Title 7 U. S. C. § 7a provides:

"Each contract market shall—

.          .          .          .          .

"(8) Enforce all bylaws, rules, regulations, and resolutions, made
or issued by it or by the governing board thereof or any committee,
which relate to terms and conditions in contracts of sale to be exe-
cuted on or subject to the rules of such contract market or relate to
other trading requirements, and which have not been disapproved
by the Secretary of Agriculture pursuant to paragraph (7) of sec-
tion 12a of this title; and revoke and not enforce any such bylaw,
rule, regulation, or resolution, made, issued, or proposed by it or
by the governing board thereof or any committee, which has been so
disapproved . . . ."

Disapproval by the Secretary is to be pursuant to 7 U. S. C.
§ 12a, which provides:

"The Secretary of Agriculture is authorized—

.          .          .          .          .

"(7) to disapprove any bylaw, rule, regulation, or resolution made,
issued or proposed by a contract market or by the governing board
thereof or any committee which relates to terms and conditions in
contracts of sale to be executed on or subject to the rules of such
contract market or relates to other trading requirements, when he
finds that such bylaw, rule, regulation, or resolution violates or will
violate any of the provisions of this chapter, or any of the rules,
regulations, or orders of the Secretary of Agriculture or the com-
mission thereunder."

standards and related reporting requirements for futures commission merchants who are members of such contract market, and which have been approved by the Secretary of Agriculture," *id.,* § 7a (9).[5] If any contract market is not enforcing its rules of government made a condition of its designation, or if it is violating any provision of the Act, the Commission, an official agency established by the Act,[6] is authorized, upon notice and hearing and subject to judicial review, to suspend or revoke the designation of the board of trade as a contract market, *id.,* § 8 (a),[7] or may

---

[5] Title 7 U. S. C. § 7a states:
"Each contract market shall—

. . . . .

"(9) Enforce all bylaws, rules, regulations, and resolutions made or issued by it or by the governing board thereof or by any committee, which provide minimum financial standards and related reporting requirements for futures commission merchants who are members of such contract market, and which have been approved by the Secretary of Agriculture."

[6] The Commission is composed of the Secretaries of Agriculture and Commerce and the Attorney General, or their designees, the Secretary of Agriculture or his designee serving as chairman, 7 U. S. C. § 2.

[7] Title 7 U. S. C. § 8 (a) provides:
"The commission is authorized to suspend for a period not to exceed six months or to revoke the designation of any board of trade as a 'contract market' upon a showing that such board of trade is not enforcing or has not enforced its rules of government made a condition of its designation as set forth in section 7 of this title or that such board of trade, or any director, officer, agent, or employee thereof, otherwise is violating or has violated any of the provisions of this chapter or any of the rules, regulations, or orders of the Secretary of Agriculture or the commission thereunder. Such suspension or revocation shall only be after a notice to the officers of the board of trade affected and upon a hearing: *Provided,* That such suspension or revocation shall be final and conclusive, unless within fifteen days after such suspension or revocation by the commission such board of trade appeals to the court of appeals for the circuit in which it has its principal place of business, by filing with the clerk of such court a written petition praying that the order of the

order such contract market and any director, officer, agent, or employee to cease and desist from such conduct, *id.*, § 13a.[8]  Under the relevant regulations, any inter-

commission be set aside or modified in the manner stated in the petition, together with a bond in such sum as the court may determine, conditioned that such board of trade will pay the costs of the proceedings if the court so directs.  The clerk of the court in which such a petition is filed shall immediately cause a copy thereof to be delivered to the Secretary of Agriculture, who shall thereupon notify the other members of the commission and file in the court the record in such proceedings, as provided in section 2112 of Title 28.  The testimony and evidence taken or submitted before the commission, duly filed as aforesaid as a part of the record, shall be considered by the court of appeals as the evidence in the case.  The proceedings in such cases in the court of appeals shall be made a preferred cause and shall be expedited in every way.  Such a court may affirm or set aside the order of the commission or may direct it to modify its order.  No such order of the commission shall be modified or set aside by the court of appeals unless it is shown by the board of trade that the order is unsupported by the weight of the evidence or was issued without due notice and a reasonable opportunity having been afforded to such board of trade for a hearing, or infringes the Constitution of the United States, or is beyond the jurisdiction of the commission."

[8] Title 7 U. S. C. § 13a states:

"If any contract market is not enforcing or has not enforced its rules of government made a condition of its designation as set forth in section 7 of this title, or if any contract market, or any director, officer, agent, or employee of any contract market otherwise is violating or has violated any of the provisions of this chapter or any of the rules, regulations, or orders of the Secretary of Agriculture or the commission thereunder, the commission may, upon notice and hearing and subject to appeal as in other cases provided for in paragraph (a) of section 8 of this title, make and enter an order directing that such contract market, director, officer, agent, or employee shall cease and desist from such violation, and if such contract market, director, officer, agent, or employee thereafter and after the lapse of the period allowed for appeal of such order or after the affirmance of such order, shall fail or refuse to obey or comply with such order, such contract market, director, officer, agent, or employee shall be guilty of a misdemeanor and, upon

ested person having information concerning such violation may request the Commission to institute proceedings, or the Commission may initiate proceedings on its own motion,[9] and there is provision for persons seeking intervention in such proceedings.[10]

conviction thereof, shall be fined not less than $500 nor more than $10,000 or imprisoned for not less than six months nor more than one year, or both. Each day during which such failure or refusal to obey such order continues shall be deemed a separate offense."

[9] Title 17 CFR § 0.53 provides:

"(a) *Application to institute proceedings.* Any interested person having any information of any violation of the act, or of any of the orders or regulations promulgated thereunder, by any board of trade or by any director, officer, agent, or employee thereof may file with the Act Administrator [see *infra*] an application requesting the institution of such proceeding as is authorized under the act. Such application shall be in writing, signed by or on behalf of the applicant, and shall include a short and simple statement of the facts constituting the alleged violation and the name and address of the applicant and the name and address of the person against whom the applicant complains." (The "Act Administrator," who "administers and is responsible for the enforcement of the [Act]," *id.*, § 140.1, is the Administrator of the Commodity Exchange Authority, United States Department of Agriculture, *id.*, § 0.52 (r).)

"(b) *Status of applicant.* The person filing an application as described in paragraph (a) of this section shall have no legal status in the proceeding which may be instituted as a result of the application, except where the applicant may be permitted to intervene therein, in the manner provided in this subpart, or may be called as a witness, and the applicant's identity shall not be divulged by any employee of the Department, except with the applicant's prior consent or upon court order.

"(c) *Who may institute.* If, after investigation [by regional offices of the Commodity Exchange Authorities, *id.*, § 140.1 (d)] of the matters complained of in the application described in paragraph (a) of this section, or after investigation made on its own motion, the Commission has reason to believe that any board of trade or any director, officer, agent, or employee thereof has violated or is violating any of the provisions of the act, or of any of the regulations promulgated thereunder, the Commission will institute an appropriate pro-

## II

It was against this statutory background that petitioner alleged he had been deprived of his membership contrary to the rules of the Exchange, the Commodity

---

ceeding: *Provided,* That in any case, except one of willfullness or one in which the public health, interest or safety otherwise requires, prior to the institution of a proceeding for the suspension or revocation of any designation of a contract market, facts or conditions which may warrant such action shall be called to the attention of the market in writing and such market shall be accorded opportunity to demonstrate or achieve compliance with all lawful requirements. Proceedings will be instituted only upon complaints issued by the Commission and will not be instituted upon pleadings filed by private persons."

Should the Commission institute proceedings after investigation, *ibid.,* unless the respondent is allowed by the Commission to consent to an order, *id.,* § 0.54, proceedings are held before a referee from the Department of Agriculture, *id.,* §§ 0.52 (p) and (s) and 0.55 *et seq.,* an oral hearing being granted on request, *id.,* § 0.61. The Commission prepares its order based on consideration of the record of the proceedings, including a report prepared by the referee, *id.,* §§ 0.66, 0.68, and 0.70, oral argument being held before the Commission in certain instances, *id.,* § 0.69.

[10] Title 17 CFR § 0.58 states:

"At any time after the institution of a proceeding, and before it has been submitted to the Commission for final consideration, the Commission or the referee may, upon petition in writing and for good cause shown, permit any person to intervene therein. The petition shall state with preciseness and particularity: (a) The petitioner's relationship to the matters involved in the proceeding, (b) the nature of the material he intends to present in evidence, (c) the nature of the argument he intends to make, (d) any other reason that he should be allowed to intervene."

As indicated in n. 2, *supra,* while the Commission has been vested with authority to take disciplinary action against a contract market and its officers, agents, and employees, the Secretary has been given such authority against persons other than contract markets, including individuals, associations, partnerships, corporations, and trusts, 7 U. S. C. § 2, and may either exclude them from trading on a contract market, *id.,* § 9, or may issue a cease-and-desist order, *id.,*

Exchange Act, and the Sherman Act. And it was in this context that the Court of Appeals, having concluded that the specific Exchange rules allegedly violated [11] were within the bounds of adjudicative and remedial jurisdiction of the Commodity Exchange Commission, directed the District Court to hold its hand and afford the opportunity for administrative consideration of the dispute between petitioner and the alleged coconspirator-defendants.

The problem to which the Court of Appeals addressed itself is recurring.[12] It arises when conduct seemingly

---

§ 13b. The regulations providing for institution of and intervention in disciplinary proceedings before the Secretary, 17 CFR §§ 0.3 and 0.8, are virtually identical to the regulations for Commission proceedings quoted above and in n. 9, *supra*.

[11] Rules the Court of Appeals found related to "trading requirements" were Rule 307, which provides for the sale of membership, and Rule 322, which concerns qualifications to trade.

Rule 307 provides:

"Membership in the Exchange is a personal privilege subject to sale and transfer only as authorized herein. When a member or the legal representative of a deceased or incompetent member desires to sell a membership, he shall sign an authorization to transfer in such form as shall be prescribed by the Board. An individual who desires to purchase a membership shall notify the President to such effect and when an agreement with a seller shall have been made shall sign a confirmation of purchase and shall deposit with the President a transfer fee in the amount of $100.00 and also a certified check, payable to the Exchange, for the amount of the agreed purchase price."

Rule 322 states:

"A member may be qualified to trade on the Spot and To-Arrive Calls provided he has been authorized by a firm or corporation which has been qualified pursuant to Rule 810 to engage in trading on said calls. A member may be qualified to trade on the futures call provided he has been authorized by a firm or corporation which is a Clearing Member."

[12] See, *e. g., Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S. 213 (1966); *United States* v. *Philadelphia National Bank,* 374

within the reach of the antitrust laws is also at least arguably protected or prohibited by another regulatory statute enacted by Congress. Often, but not always, the other regime includes an administrative agency with authority to enforce the major provisions of the statute in accordance with that statute's distinctive standards, which may or may not include concern for competitive considerations.

*Silver* v. *New York Stock Exchange,* 373 U. S. 341 (1963), was a case where the conduct challenged in an antitrust complaint was not within the jurisdiction of an administrative agency but was nevertheless claimed to be immune from antitrust challenge by virtue of the Securities Exchange Act of 1934. Silver sought to recover damages allegedly suffered when his wire connections with Exchange members were terminated without notice or hearing under Exchange rules adopted pursuant to the Securities Exchange Act of 1934, 48 Stat. 881, as amended, 15 U. S. C. § 78a *et seq.* Under this Act, the Securities and Exchange Commission had general power to approve or disapprove Exchange rules, but it had no authority to deal with challenges, such as Silver's, to specific applications of Exchange rules. Moreover, the statute conferred on the Exchange no express exemption from the antitrust laws. We declined to hold that Congress intended to oust completely the antitrust laws and supplant them with the self-regulatory scheme authorized

U. S. 321 (1963); *Silver* v. *New York Stock Exchange,* 373 U. S. 341 (1963); *Pan American World Airways* v. *United States,* 371 U. S. 296 (1963); *California* v. *FPC,* 369 U. S. 482 (1962); *United States* v. *Radio Corp. of America,* 358 U. S. 334 (1959); *Far East Conference* v. *United States,* 342 U. S. 570 (1952); *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439 (1945); *United States* v. *Borden Co.,* 308 U. S. 188 (1939); *United States Navigation Co.* v. *Cunard S. S. Co.,* 284 U. S. 474 (1932); *Keogh* v. *Chicago & N. W. R. Co.,* 260 U. S. 156 (1922).

by the Exchange Act. Repeal of the antitrust laws was to be implied "only if necessary to make the Securities Exchange Act work, and even then only to the minimum extent necessary." 373 U. S., at 357. The question thus became the extent to which, if any, the "character and objectives of the duty of exchange self-regulation contemplated by the Securities Exchange Act are incompatible with the maintenance of an antitrust action." *Id.,* at 358. Conceding that the "entire public policy of self-regulation, beginning with the idea that the Exchange may set up barriers to membership, contemplates that the Exchange will engage in restraints of trade which might well be unreasonable absent sanction by the Securities Exchange Act," *id.,* at 360, and hence that "particular instances of exchange self-regulation which fall within the scope and purpose of the Securities Exchange Act may be regarded as justified in answer to the assertion of an antitrust claim," *id.,* at 361, the Court finally concluded that nothing in the terms or policy of the Act required or contemplated that a self-regulating exchange be permitted to impose serious deprivations without notice and opportunity for a hearing, and that neither the statute nor Exchange rules posed any legal barrier to the antitrust action.

In arriving at this conclusion, the Court expressly noted that the Securities and Exchange Commission had no authority to review specific instances of enforcement of Exchange rules; that this "obviate[d] any need to consider whether petitioners were required to resort to the Commission for relief before coming into court," *id.,* at 358, and avoided "any problem of conflict or coextensiveness of coverage with the agency's regulatory power," *ibid.;* and that if there had been such jurisdiction in the Commission with "ensuing judicial review . . . a different case would arise concerning exemption from

the operation of laws designed to prevent anticompetitive activity, an issue we do not decide today." *Id.,* at 358 n. 12.

That "different case" is now before us, but in the context of the Commodity Exchange Act, and we agree with the Court of Appeals that, given administrative authority to examine the Ricci-Exchange dispute in the light of the regulatory scheme and Exchange rules, the antitrust action should be stayed until the administrative officials have had opportunity to act. This judgment rests on three related premises: (1) that it will be essential for the antitrust court to determine whether the Commodity Exchange Act or any of its provisions are "incompatible with the maintenance of an antitrust action," *id.,* at 358; (2) that some facets of the dispute between Ricci and the Exchange are within the statutory jurisdiction of the Commodity Exchange Commission; and (3) that adjudication of that dispute by the Commission promises to be of material aid in resolving the immunity question.[13]

---

[13] Thus our judgment is not that Congress intended the Commodity Exchange Act to be the exclusive instrument for the governance of the Exchange and its members. The purpose and structure of the Act and our past cases appear to foreclose any such conclusion. *Carnation Co.* v. *Pacific Westbound Conference, supra; United States* v. *Philadelphia National Bank, supra; Silver* v. *New York Stock Exchange, supra; Pan American World Airways* v. *United States, supra; United States* v. *Borden Co., supra.* Nor do we find that Congress intended the Act to confer general antitrust immunity on the Exchange and its members with respect to that area of conduct within the adjudicative or rule-making authority of the Commission or the Secretary. See *United States* v. *Philadelphia National Bank,* 374 U. S., at 350–354; *California* v. *FPC, supra; Maryland & Virginia Milk Producers* v. *United States,* 362 U. S. 458 (1960); *United States* v. *Radio Corp. of America,* 358 U. S., at 339–352. The Act contains no categorical

As to the first premise, the argument that the Commodity Exchange Act to some extent limits the applicability of the antitrust laws, and may limit them in this case, is plainly substantial. Repeal of the antitrust laws is not to be lightly assumed. *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 350 (1963); *Silver* v. *New York Stock Exchange, supra,* at 357; *California* v. *FPC,* 369 U. S. 482, 485 (1962); *Georgia* v. *Pennsylvania R. Co.,* 324 U. S. 439, 456–457 (1945); *United States* v. *Borden Co.,* 308 U. S. 188, 198 (1939). But here the express will of Congress is that to deal in commodity futures one must either be, or deal through, a member of a board of trade having specified qualifications and carrying official designation as a contract market. The Act clearly contemplates a membership organization and hence the existence of criteria for the acquisition, transfer, and loss of membership. The Chicago Mercantile Exchange has such membership rules, and it had the statutory duty to enforce them to the extent that they constituted or were related to "trading requirements," 7 U. S. C. § 7a (8). If the transfer of Ricci's membership was pursuant to a valid rule, the immediate question for the antitrust court is whether the rule itself and Ricci's exclusion under it are insulated from antitrust attack. The question has substance, for the Commodity Exchange Act, like the Securities Exchange

exemption of this kind; indeed, it confers no express exemption at all, not even with respect to conduct that is directed or authorized by the Commission or the Secretary. Moreover, the area of administrative authority does not appear to be particularly focused on competitive considerations; there is no express provision in the Act directing administrative officials to consider the policies of the antitrust laws in carrying out their duties and there is no other indication that Congress intended the adjudicative authority given the Commission and the Secretary to be a complete substitute for judicial enforcement of the antitrust laws. Cf. *California* v. *FPC, supra.*

Act, contemplates that the Exchange and its members will "engage in restraints of trade which might well be unreasonable absent sanction" by the Act. *Silver* v. *New York Stock Exchange, supra,* at 360. See *Board of Trade of the City of Chicago* v. *United States,* 246 U. S. 231, 238 (1918). On the other hand, if, as Ricci alleges, loss of his membership was contrary to Exchange rules, the antitrust action should very likely take its normal course, absent more convincing indications of congressional intent than are present here that the jurisdictional and remedial powers of the Commission are exclusive.

The question whether this membership dispute is within the jurisdiction of the Commodity Exchange Commission, the second premise for our judgment, was answered in the affirmative by the Court of Appeals. Because trading in futures may be done only by or through members, the membership rules of the Exchange were held to relate to "trading requirements" and were thus among those rules which the Exchange could not ignore without violating the Act and bringing itself within the jurisdiction of the Commission to adjudicate and remedy any violation "of the provisions of this chapter or any of the rules, regulations, or orders of the Secretary . . . or the commission thereunder . . . ." 7 U. S. C. §§ 8 (a) and 13a. We need not finally decide the jurisdictional issue for present purposes, but there is sufficient statutory support for administrative authority in this area that the agency should at least be requested to institute proceedings.[14]

---

[14] MR. JUSTICE MARSHALL's dissent complains that jurisdiction of the Commodity Exchange Commission is not clear, that the Commission need not institute proceedings, that the complainant must intervene to become a party, and that agency remedies are discretionary. But proceeding by complaint and intervention is not an unusual system for invoking administrative action. And surely if administrative

We also think it very likely that a prior agency adjudication of this dispute will be a material aid in ultimately deciding whether the Commodity Exchange Act forecloses this antitrust suit, a matter that seems to depend in the first instance on whether the transfer of Ricci's membership was in violation of the Act for failure to follow Exchange rules. That issue in turn appears to pose issues of fact [15] and questions about the scope, meaning, and significance of Exchange membership rules. These are matters that should be dealt with in the first instance by those especially familiar with the customs and practices of the industry and of the unique marketplace involved in this case. *United States v. Western Pacific R. Co.*, 352 U. S. 59, 64–65, 65–66 (1956); *Far East Conference v. United States*, 342 U. S. 570, 574–575 (1952). They are matters typically lying at the heart of an administrative agency's task and here they appear to be matters that Congress has placed within the jurisdiction of the Commodity Exchange Commission. We should recognize "that the courts, while retaining the final authority to expound the statute, should avail themselves of the aid implicit in

---

proceedings are sought in vain, there would be no further problem for the antitrust court. In any event it should be pointed out that the regulations require investigation of complaints and provide that "the Commission *will institute* an appropriate proceeding" if investigation reveals reason to believe that the Act is being violated. 17 CFR § 0.53 (c). (Emphasis added.) See n. 9, *supra*.

[15] Likely issues for the factfinder are whether Ricci revoked the transfer authorization before or after he was informed that his membership was transferred; whether the transfer authorization was valid; whether the Trading Company had a lien against Ricci's membership because of its loan to Ricci for the purchase of a membership; whether the Trading Company owed brokerage fees to Ricci; and, if so, whether these brokerage fees could be offset against the debt for the membership purchase.

the agency's superiority in gathering the relevant facts and in marshaling them into a meaningful pattern." *Federal Maritime Board v. Isbrandtsen Co.*, 356 U. S. 481, 498 (1958). The adjudication of the Commission, if it is forthcoming, will be subject to judicial review and would obviate any necessity for the antitrust court to relitigate the issues actually disposed of by the agency decision. Cf. *United States v. Philadelphia National Bank*, 374 U. S., at 353–354; *Federal Maritime Board v. Isbrandtsen Co., supra,* at 498–499. Of course, the question of immunity, as such, will not be before the agency; but if Ricci's complaint is sustained, the immunity issue will dissolve, whereas if it is rejected and the conduct of the Exchange warranted by a valid membership rule, the court will be in a much better position to determine whether the antitrust action should go forward. Affording the opportunity for administrative action will "prepare the way, if the litigation should take its ultimate course, for a more informed and precise determination by the Court of the scope and meaning of the statute as applied to [these] particular circumstances." *Ibid.*

### III

MR. JUSTICE MARSHALL's dissent concedes, as it must, that it is essential for the antitrust court to make proper accommodation "between usual antitrust principles and the self-regulatory and exclusionary powers that the exchanges were obviously intended to exercise." It also concedes that where the regulatory regime is administered by an agency, the antitrust court will stay its hand to permit institution of administrative proceedings if they are "likely to make a meaningful contribution to the resolution of this lawsuit." Our differences thus narrow to whether proceedings in the Commodity Exchange

Commission would be of sufficient aid to justify a stay of this antitrust action.

The dissent asserts that for present purposes the only relevant issue in the antitrust action is "whether either the rules, or their application, serves a legitimate self-regulatory goal," that the Commission has no jurisdiction to determine facts relevant to whether Exchange rules are consistent with or essential to legitimate self-regulatory ends, and that we have mistakenly premised our opinion on the existence of such jurisdiction, without which there is no basis for deferring to agency proceedings.[16]  This misapprehends our opinion and fails to come to grips with reality.  We make no claim that the Commission has authority to decide either the question of immunity as such or that any rule of the Exchange takes precedence over antitrust policies.  Rather, we simply recognize that Congress has established a specialized agency that would determine either that a membership rule of the Exchange has been violated or that it has been followed.  Either judgment would require determination of facts and the interpretation and application of the Act and Exchange rules.  And either determination will be of great help to the antitrust court in arriving at the essential accommodation between the antitrust and the regulatory regimes: The problem disappears entirely if it is found that there has been a violation of the rule; on the other hand, if it is found that the Exchange has merely followed and enforced its own rules, the antitrust court will be in a posi-

---

[16] MR. JUSTICE MARSHALL's dissent also asserts that because Ricci's complaint asserts a conspiracy, the matter at issue lies beyond any possible self-regulatory goals of the Exchange.  But this simply ignores and refuses to accept the factfinding function of the Commission.  It also fails to recognize that the allegation simply characterizes as a conspiracy what may be an attempt to invoke the membership rules of the Exchange.

tion to make a more intelligent and sensitive judgment as to whether the antitrust laws will punish what an apparently valid rule of the Exchange permits.

Accordingly, the judgment is affirmed.

*So ordered.*

Mr. Chief Justice Burger, concurring.

As I read the Court's opinion, it plainly disclaims any resolution of the issue left open in *Silver* v. *New York Stock Exchange,* 373 U. S. 341 (1963)—namely, the question of which "particular instances of exchange self-regulation" occurring within a statutory scheme providing for self-regulation may be regarded as "justified in answer to the assertion of an antitrust claim" against the Exchange and its members. Indeed, the *Silver* problem is not before us. The Court of Appeals was careful to note that it expressed "no opinion on any antitrust immunity that might result from action or inaction taken by the Commission or the Secretary of Agriculture in this case." 447 F. 2d 713, 720 n. 18.

The Court holds that the Commodity Exchange Commission may materially aid in proper consideration of petitioner's antitrust claims by determining whether respondents violated a rule of the Exchange. The Court's opinion should not be read to suggest that the Commission's resolution of the dispute either will or will not foreclose subsequent application of the antitrust laws.

With this understanding, I join the Court's opinion.

Mr. Justice Douglas, dissenting.

While I concur in my Brother Marshall's dissent, I wish to add that even if the Commodity Exchange Commission were empowered to make a determination regarding the relief sought by petitioner, it would appear to be an anomaly to direct the plaintiff in a civil action to a federal supervising agency for a determination as to

whether the regulations which it is charged to enforce have been violated, when the agency has, by its inaction, already shown every indication of sanctioning the alleged violation. By remanding, we are requiring the petitioner to seek from the regulators an admission of their failure to regulate (or negligence in regulating).

The odds of petitioner's getting the Commodity Exchange Commission now to find a violation in contradiction of its past inaction do not, in my view, justify the expense and delay to the petitioner. In the interests of orderly and efficient judicial administration, parties are not generally required to engage in futile gestures. This inequity is even more pronounced since, as MR. JUSTICE MARSHALL points out in his dissent, the Commodity Exchange Commission has neither the authority nor power to make a determination on the issues underlying the civil action.

My concern about remitting parties in federal court litigation to state courts or to federal administrative agencies for resolution of collateral questions of law is stated in my dissent in *Clay* v. *Sun Insurance Office,* 363 U. S. 207, 227–228; see also *England* v. *Louisiana Board of Medical Examiners,* 375 U. S. 411, 429 (concurring opinion). The road this litigant is now required to travel to obtain justice is equally long and expensive and available only to those with long purses, even though he is remitted only to a federal regulatory agency.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE STEWART, and MR. JUSTICE POWELL join, dissenting.

The majority accurately describes the provisions of the Commodity Exchange Act and the facts of this case. But my Brethren nowhere explain why the lower court should stay its hand pending action by an agency which in all likelihood lacks the statutory power to

resolve an issue in the lawsuit. Instead of carefully balancing the advantages and disadvantages of deferral to the agency, the Court seems to apply a mechanical test which requires judicial deference despite the substantial probability that the agency will have nothing of relevance to contribute. The principle that should govern this case can be stated quite adequately in a single sentence: An agency cannot have primary jurisdiction over a dispute when it probably lacks jurisdiction in the first place. The majority seemingly departs from this principle[1] and, hence, needlessly bifurcates and complicates a suit that could readily be resolved by the District Court. I must therefore respectfully dissent.

I

At the outset, it should be noted that the Commodity Exchange Act fails to provide petitioner with a means by which he can require the Commodity Exchange Commission or the Secretary of Agriculture to consider his case. The Act provides that "[t]he Secretary of Agriculture is *authorized* . . . to disapprove any bylaw, rule, regulation, or resolution made, issued or proposed by a contract market." 7 U. S. C. § 12a (7) (emphasis added). Similarly, "[i]f any contract market is not en-

---

[1] The majority suggests that the Court "need not finally decide the jurisdictional issue for present purposes." Rather, it holds that the likelihood of agency jurisdiction is sufficient to require judicial abstention. This approach could well lead to an extraordinary result. Since the Court expressly leaves the jurisdictional issue open, it is possible that at some later date, it will be held that the agency lacks jurisdiction over this dispute. In that event, petitioner will have been forced to resort to possibly lengthy administrative proceedings, only to be told at their conclusion that they were irrelevant to his case. My approach is somewhat different. I submit that the jurisdiction of the relevant agency is a threshold issue in cases such as this and that before a court defers to agency judgment, it should authoritatively determine whether the agency has power to act.

forcing or has not enforced its rules of government made a condition of its designation . . . the commission *may* . . . make and enter an order directing that such contract market . . . shall cease and desist from such violation." 7 U. S. C. § 13a (emphasis added). But although the relevant regulations provide a means by which a private party may report apparent violations— see 17 CFR §§ 0.3 (a), 0.53 (a)—the Act nowhere requires the Secretary or the Commission to act on these reports. Cf. *Vaca* v. *Sipes,* 386 U. S. 171, 182 (1967). On the contrary, the Act expressly provides that "[n]othing in this chapter shall be construed as requiring the Secretary of Agriculture or the commission to report minor violations of this chapter for prosecution, whenever it appears that the public interest does not require such action." 7 U. S. C. § 13c (b).

Moreover, even if the Secretary or the Commission does institute proceedings at petitioner's behest, it is by no means certain that petitioner will be permitted to participate in those proceedings. The Commission's rules state that "[t]he person filing an application [to institute proceedings] shall have no legal status in the proceeding which may be instituted as a result of the application, except where the applicant *may* be permitted to intervene therein . . . or may be called as a witness." 17 CFR § 0.53 (b) (emphasis added). See also 17 CFR § 0.3 (b). Although Commission rules provide for the intervention of private parties, the Commission apparently has unfettered discretion in deciding whether to allow intervention. See 17 CFR § 0.58. See also 17 CFR § 0.8.[2]

---

[2] I do not intend to foreclose the possibility that petitioner might be able to intervene under § 6 (a) of the Administrative Procedure Act, 5 U. S. C. § 555 (b). See, *e. g., American Communications Assn.* v. *United States,* 298 F. 2d 648, 650 (CA2 1962). Petitioner's

Should the Commission or the Secretary not allow intervention in this case, this Court's decision will leave the District Judge on the horns of a serious dilemma. Normally, when a court stays its hand to allow agency proceedings, the result of those proceedings may not be collaterally attacked when the case returns to the court. See, *e. g., Port of Boston Marine Terminal Assn.* v. *Rederiaktiebolaget Transatlantic*, 400 U. S. 62, 71–72 (1970). But if the Commission decides a major issue in this lawsuit without allowing petitioner to intervene, failure to permit collateral attack would result in petitioner's antitrust case being resolved against him without his participation. On the other hand, if the District Court undertakes a *de novo* reconsideration of the issues submitted to the Commission, the Commission's decision, together with the concomitant delay, will be for naught.

## II

The Court, then, remands petitioner to a procedure which he has no power to invoke, in which he has no right to participate if it is invoked, and which cannot provide the remedy he seeks even if he is allowed to participate.[3] Yet all this might be justifiable if either the Commission or the Secretary were likely to make a meaningful contribution to the resolution of this lawsuit. We have held that "[w]hen there is a basis for judicial action, independent of agency proceedings, courts

---

ability to invoke this provision is, however, problematical at best. Cf. *Easton Utilities Comm'n* v. *AEC*, 137 U. S. App. D. C. 359, 362–365, 424 F. 2d 847, 850–853 (1970). See generally Shapiro, Some Thoughts on Intervention before Courts, Agencies, and Arbitrators, 81 Harv. L. Rev. 721, 764–767 (1968).

[3] Although the Commission may issue cease-and-desist orders and recommend criminal prosecutions, it, of course, lacks authority to award treble damages.

may route the threshold decision as to certain issues to the agency charged with primary responsibility for governmental supervision or control of the particular industry or activity involved." *Id.,* at 68. The reason for this policy is self-evident: "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." *Far East Conference* v. *United States,* 342 U. S. 570, 574 (1952).

Thus, if the Commodity Exchange Commission had jurisdiction over some aspect of this suit and special expertise in the area of its jurisdiction, a case could, perhaps, be made for awaiting its decision. For example, if the Commission had been given the power to grant general immunity to antitrust violators, sound judicial administration would require consultation with it before proceeding with the antitrust suit. But, as the majority itself recognizes, there is no indication that Congress intended to grant the Commission any such power. As this Court held in *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S. 213, 218 (1966), "[w]e have long recognized that the antitrust laws represent a fundamental national economic policy and have therefore concluded that we cannot lightly assume that the enactment of a special regulatory scheme for particular aspects of an industry was intended to render the more general provisions of the antitrust laws wholly inapplicable to that industry." In practice, this principle has meant that "[r]epeals of the antitrust laws by implication from a regulatory statute are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust and regulatory provisions." *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 350–351 (1963) (footnotes omitted). Such repugnancy

has been found to exist only in those rare cases where regulation of the industry is pervasive and Congress plainly intended to substitute Government supervision for competition. See, *e. g., Pan American World Airways* v. *United States,* 371 U. S. 296 (1963). Cf. *United States* v. *Radio Corp. of America,* 358 U. S. 334 (1959).

Obviously, Congress has not granted the Commission the sort of pervasive power over commodity exchanges that would give rise to antitrust exemption. On the contrary, although the Commission and the Secretary have some general policing duties, day-to-day regulation has been largely left to the industry itself. Where, as here, the industry is given the power to control its own affairs, it is particularly important to make certain that this power is not abused for the purpose of eliminating competition. Cf. *Silver* v. *New York Stock Exchange,* 373 U. S. 341 (1963).

The majority cannot rely, then, on the Commission's general power to immunize antitrust violations. Its argument, as I understand it, is more subtle and, at the same time, more attenuated. As we recognized in *Silver* v. *New York Stock Exchange, supra,* the very purpose of an exchange is to exclude nonmembers from participation in trading. Were it not for the legislative authorization of such exchanges, they would constitute group boycotts that are *per se* violations of the Sherman Act. See, *e. g., Klor's, Inc.* v. *Broadway-Hale Stores,* 359 U. S. 207 (1959). Thus, although Congress cannot be taken to have granted total antitrust immunity to trading exchanges, some accommodation must be reached between usual antitrust principles and the self-regulatory and exclusionary powers that the exchanges were obviously intended to exercise. In *Silver,* the Court reached such an accommodation by holding that "exchange self-regulation is to be regarded

as justified in response to antitrust charges only to the extent necessary to protect the achievement of the aims of the Securities Exchange Act." 373 U. S., at 361. Thus, if an exchange rule serves a valid self-regulatory purpose, the mere fact that it excludes some individuals from competition does not mean that an antitrust violation has been made out. But where, as in *Silver* itself, the rule fails to serve any legitimate self-regulatory goal, its exclusionary effect can lay the predicate for a Sherman Act violation.

Applying *Silver* to the facts of this case, the majority argues that the Commission has primary jurisdiction to determine facts relevant to the question whether the Chicago Mercantile Exchange's rules and its application of those rules are in conformity with the self-regulatory purposes of the Commodity Exchange Act. Superficially, at least, that argument has considerable force. It is marred, however, by two flaws which, in my view, make it ultimately fallacious.

First, it is important to note that petitioner's complaint does not merely allege that he has been excluded from trading or that an Exchange rule has been broken. Rather, he maintains that the Exchange and certain of its members entered a deliberate conspiracy against him and that this was done "maliciously, wilfully, knowingly, unlawfully and without just cause or provocation, with the unlawful and illegal intent, purpose and object of restraining and preventing plaintiff from exercising an essential and necessary part of his lawful trade or business in interstate commerce." Whatever the legitimate self-regulatory goals of the Chicago Mercantile Exchange, I cannot believe that they include the deliberate and malicious suppression of competition. Surely, the courts do not need the Commodity Exchange Commission to tell them that such conduct is antithetical to the purposes of the Commodity Exchange Act. We have held that prin-

ciples of administrative comity preclude courts from finding antitrust violations "only . . . when the defendants' conduct is arguably lawful" under the administrative scheme. *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S. 213, 222 (1966). I would apply that principle here and hold that deliberate conspiracies with the sole purpose of suppressing competition are not "arguably lawful" under the Commodity Exchange Act.[4]

To be sure, it may ultimately develop that petitioner is unable to substantiate all of his allegations and that the actions of the Exchange are less sinister than he has made out. Petitioner might be required to submit affidavits before trial demonstrating that his allegations of a deliberate conspiracy are factually supported in order to forestall a remand to the Commission. And if it becomes clear at any time during trial that the conspiracy allegations are insubstantial, there will then be time enough to reconsider the propriety of a delay pending Commission action. But I would not deprive petitioner of immediate access to the courts until he has had an opportunity to prove that the case is as clear as he says it is.

Moreover, even if petitioner's allegations are for some reason insufficient to forestall a remand to the Commission, I still doubt that the Court of Appeals acted properly in ordering a stay of the litigation. The majority's position is premised on the assumption that the Com-

---

[4] This position does not, as the majority argues, "[ignore] . . . the factfinding function of the Commission." Rather, it is premised on the seemingly obvious proposition that there must be a jurisdictional predicate to support agency factfinding. I can find nothing in the Commodity Exchange Act that authorizes the Commission to determine whether exchanges and their members are engaged in conspiracies or whether the actions taken by exchanges are motivated by anticompetitive purposes. Nor is it clear to me why such factfinding might be made in the course of determining whether an Exchange rule had been violated.

mission has jurisdiction to determine facts relevant to whether Exchange rules, or the application of those rules, is consistent with legitimate self-regulatory ends.[5] But a careful examination of the Act makes plain that this assumption is simply incorrect.[6] Neither the agency nor the Secretary has been granted a roving commission to oversee the proper functioning of the various exchanges. Rather, the powers conferred in the Act are limited and discrete, and none of them grants to the Commission the tools necessary for resolving any issue in this dispute.

The Commission does have authority to oversee the exchanges' administration of their own rules. 7 U. S. C. § 7a (8) requires exchanges to "[e]nforce all bylaws, rules, regulations, and resolutions, made or issued by it or by the governing board thereof or any committee, which relate to . . . trading requirements," and 7 U. S. C. § 13a permits the Commission to issue a cease-and-desist order "[i]f any contract market is not enforcing or has not enforced its rules of government made a condition of its designation as set forth in section 7 of this title." But it should be obvious that these provisions do not

---

[5] But cf. n. 1, *supra*.

[6] To be sure, as the majority recognizes, the Commission does have factfinding power and, in the course of determining whether the Exchange rules have been violated, it might exercise that power to resolve the underlying facts in dispute. But the majority cites no cases where the mere factfinding power of an agency has been used to invoke primary jurisdiction in the absence of an issue of law or a mixed question of law and fact common to the agency proceeding and the court action. The Commission may have special expertise that will aid it to determine whether a given rule has been violated or whether the rule is consistent with the Act. But it has no special ability to determine pure questions of fact unrelated to the legal standard relevant in the antitrust suit. On the contrary, I had thought that it was our court system—with its long tradition of jury trials, adversary proceedings, and highly developed evidentiary principles—that was "expert" in the simple factfinding process.

authorize the Commission to resolve the *Silver* issue. The quoted sections permit the Commission to determine whether the rules made by an exchange are being enforced. But they do not permit the Commission to decide whether either the rules, or their application, serves a legitimate self-regulatory goal, which is the only relevant issue in the antitrust suit. Thus, it is entirely possible that although the Chicago Mercantile Exchange has respected its own rules to the letter, those rules themselves are impermissible under the Sherman Act. Similarly, even if the rules are facially permissible, it is possible that, as applied in this case, they restrain competition without any offsetting self-regulatory gain. The mere fact that an exchange is obeying its own rules—the only question that 7 U. S. C. §§ 7a (8) and 13a permit the Commission to answer—does not tell us whether either the rules or their application meets the *Silver* test.

The Secretary is given supplementary power to invalidate certain exchange rules. But this power, too, is extremely limited. Title 7 U. S. C. § 12a (7) empowers the Secretary to "disapprove any bylaw, rule, regulation, or resolution made, issued or proposed by a contract market . . . which relates to . . . trading requirements, when he finds that such bylaw, rule, regulation, or resolution violates or will violate any of the provisions of *this chapter,* or any of the rules, regulations, or orders of the Secretary of Agriculture or the commission thereunder." (Emphasis added.) The "chapter" referred to is, of course, the Commodity Exchange Act, not the Sherman Act, and no provision of the Commodity Exchange Act incorporates Sherman Act principles. It follows that § 12a (7) does not empower the Secretary to invalidate exchange rules because they conflict with antitrust policy.

Moreover, as noted above, the restrictions placed on the exchanges by the Act are far from pervasive, and the Secretary's power to invalidate rules is therefore similarly restricted. Surely, this power does not include the ability to invalidate any rule that fails to serve a self-regulatory end. Such a reading of the Act would mean that Congress thought it had prohibited everything an exchange might do that would not serve self-regulatory purposes—a reading that defies common sense. Thus, if the Secretary were to refuse to invalidate the rules involved in this action, his decision would only mean that those rules were not prohibited by any specific provision of the Commodity Exchange Act. The decision could in no way be taken to mean that the rule serves any useful purpose or that it meets the *Silver* requirement.[7]

### III

I do not mean to suggest that the Commission's consideration of this case is certain to prove totally useless when the District Court ultimately resumes its deliberations. Should the Secretary invalidate the rules that the Commission relies on, for example, his action would materially aid petitioner, although his claim would still

---

[7] The *Silver* case itself neatly illustrates this fact. In *Silver*, the rule in question provided for the termination of wire connections with Exchange members without notice or hearing. This Court held that the failure to provide notice or hearing served no legitimate self-regulatory goal and therefore held that an antitrust violation had been made out. Had the *Silver* case arisen in the context of the Commodity Exchange Act, the Secretary could not have invalidated the Exchange rule since no provision of the Act requires an exchange to hold hearings before it takes disciplinary action. But, of course, the Secretary's decision not to invalidate the rule would in no way have changed the Court's ultimate conclusion that the rule served no valid self-regulatory purpose. Hence, invocation of the Secretary's primary jurisdiction would have been a useless act.

not be conclusively established since the Exchange's actions might be justified by a legitimate regulatory purpose, even though the rule relied upon violated a provision of the Act. Similarly, the Commission may make findings of fact or statements as to the law within areas of its expertise which the court might find helpful.

But I had not thought that petitioner need meet the burden of showing that resort to administrative remedies would be totally useless before securing adjudication from a court. Indeed, in virtually every suit involving a regulated industry, there is something of value that an administrative agency might contribute if given the opportunity. But we have never suggested that such suits must therefore invariably be postponed while the agency is consulted.

It has been argued that the doctrine of primary jurisdiction involves a mere postponement, rather than relinquishment of judicial jurisdiction. See, *e. g.,* 3 K. Davis, Administrative Law Treatise 3–4 (1958). However, that observation should not be taken to mean that invocation of the doctrine therefore imposes no costs. On the contrary, in these days of crowded dockets and long court delays, the doctrine frequently prolongs and complicates litigation. More fundamentally, invocation of the doctrine derogates from the principle that except in extraordinary situations, every citizen is entitled to call upon the judiciary for expeditious vindication of his legal claims of right. As we have said in a somewhat different context "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Boddie* v. *Connecticut,* 401 U. S. 371, 377 (1971). And surely the right to a "meaningful opportunity to be heard" comprehends within it the right to be heard without unreasonable delay. This

principle is especially worthy of protection in the anti-trust field where it is unmistakably clear that Congress has given courts, rather than agencies, the primary duty to act. Cf. *California* v. *FPC*, 369 U. S. 482, 487–490 (1962).

To be sure, judicial deference to agency jurisdiction remains important, particularly in those areas where the responsibilities of judges and administrators meet and overlap. But the primary jurisdiction doctrine, like the related exhaustion requirement, must not be "applied blindly in every case" without "an understanding of its purposes and of the particular administrative scheme involved." *McKart* v. *United States*, 395 U. S. 185, 193, 201 (1969). Wise use of the doctrine necessitates a careful balance of the benefits to be derived from utilization of agency processes as against the costs in complication and delay. Where the plaintiff has no means of invoking agency jurisdiction, where the agency rules do not guarantee the plaintiff a means of participation in the administrative proceedings, and where the likelihood of a meaningful agency input into the judicial process is remote, I would strike a balance in favor of immediate court action. Since the majority's scale is apparently differently calibrated, I must respectfully dissent.