ALMON, Justice.
As of May 23, 1976, McNeill was in the process of constructing his own residence and a neighbor’s residence[1] on Dauphin Island. On May 25, 1976, a moratorium was to go into effect prohibiting further installation of septic tanks on Dauphin Island. When McNeill attempted to install septic tanks on May 23, he was stopped by an inspector for the Mobile County Board of Health because he did not then have his plumbing “roughed in,” a prerequisite to receiving a permit for the septic tanks.
On September 14,1976, McNeill filed suit in the Circuit Court of Mobile County seeking injunctive relief, which was granted. We reverse and remand.
The history of septic tank installation on Dauphin Island and the eventual moratorium is presented by the testimony of James E. Fibbe, Director of the Bureau of Environmental Health at the Mobile County Board of Health and by Dr. George W. Newburn, County Health Officer for the Mobile County Board of Health.
The testimony of James E. Fibbe, in pertinent part, is as follows:
“Q. All right, under the criteria established by the rules and regulations which you administer, would a septic tank system normally be permissible in an area of soil and water conditions such as Dauphin Island?
*304 “A. Under the rules and regulations, a water table shallower than five feet would prohibit the installation of septic tanks and disposal systems. There is also some question as to the percolation time in coarse sand type materials. This will allow the material to pass through the coarse sand and part of the purpose of the septic tank is the filtering capability of the soil.
“Q. All right, and septic tanks have been allowed to be installed on Dauphin Island in the past, is that correct?
“A. Yes sir.
“Q. How was this handled under the rules and regulations?
“A. This was handled, Dauphin Island was handled as an exception to the rules and regulations, basically because of the sparseness of the development on Dauphin Island for a long period of time. It was relatively uninhabited or sparsely settled and septic tanks were allowed to go in. . ”
Testimony of Dr. Newburn:
“Q. Dr. Newburn, evidence has been shown that fecal coliform can be seen and other tests which indicate the presence of bacteria on Dauphin Island. What does that mean to you as County Health Officer in terms of public health?
“A. It means that the possibilities for disease production on Dauphin Island are very readily available.
“Q. What to you mean by possibilities?
“A. We have tested the water, drainage water in the ditches and have found salmonella growing in numerous areas on Dauphin Island. There is only one place that these bacteria could come from and that is from wash out from the septic tank fields into the- — there is no drainage system on Dauphin Island except ditches, and this drains directly into the ditches and then into the water surrounding Dauphin Island.
“Q. Doctor, why was May 25th, 1976, chosen as the cut-off date for stopping septic tank installation?
“A. Because I had had conversation with the State Health Department and with the Federal people about the possibility of putting a moratorium on septic tanks on Dauphin Island because I had been, become convinced that septic tanks were where it was reaching a critical point. In November of 1975 and in December of 1975 I had approached the State Health Department with the idea of a permanent moratorium on Dauphin Island and of course, this went through requests from the whole Board of Health. The reasons for this that we gave the State Health Department people, and they said, well, you have got to — we had been accumulating evidence, bacterial counts and accumulating evidence all during this period for over a year prior to this time. We had gotten to the point where I, although I wanted to do it, I had to have the acquiscence of the State people at the same time and on the advice of the attorneys and on the advice of the State Attorney General we were told that before we put a moratorium, a permanent moratorium on septic tanks, that we would have to have an opening for construction within a certain time and it had to be a set date, and that beyond that date there was to be no construction. This was worked out with the State people and May the 25th was set as the date.
“Q. All right Dr. Newburn, have any people been allowed to continue to build or put in septic tanks after this date?
“A. No sir. ...”
McNeill received his first variance November 22,1974. By its terms, the “[bjuild-ing must be commenced within 6 months of issuance date.” A second variance, issued June 27, 1975, specified that the “[bjuilding must be well under construction prior to December 31, 1975, (as all variances will be invalid after December 31, 1975.)” On December 8, 1975, the Board, due to a disruption of transportation over the bridge to the island, extended the variance to January 31, 1976. On February 25, 1976, McNeill received a letter from Dr. Newburn explaining that the Board voted to allow installation of septic tanks “for a limited time *305 under specified conditions.” The attached sheet specified the following:
“1. No septic tank will be allowed to be installed and-or connected for use after 5:00 P.M., May 25, 1976.
“3. Plumbing permits must be obtained from the Board of Health prior to installation of any plumbing.
“4. Permits to install a septic tank system will be issued only after all plumbing has been completed, inspected, and approved for a ‘rough in’ inspection by the Mobile County Board of Health Plumbing Inspector. This includes all parts of the plumbing except the setting of fixtures.
In the latter part of 1975 Mrs. Dees had orally contracted with Mr. McNeill to build a house for her similar to the one he was building for himself, which was a custom designed circular home requiring special plans and materials. As of December 31, 1975, plans had been drawn and substantial materials ordered for the residences, but no construction has taken place. As of May 25, 1976, McNeill had, on his residence, the pilings on which the house would set and the flooring in. On the Dee’s residence only the pilings were in. None of the plumbing was installed. As previously mentioned, a county inspector has refused to allow McNeill to install the septic tanks 2 days before the deadline because the plumbing had not been roughed in.
On May 25,1976, McNeill wrote Dr. New-burn explaining his situation. With regard to the roughing-in requirement, McNeill stated:
“ . . . My permit made no mention of this and I had not been notified of it. My understanding of what I had read was that this applied to new permits. I considered my house well under construction with the pilings and' floor framing in, and $13,000.00 spent on material, as my permit specified.”
On May 26, 1976, McNeill received a letter from James Fibbe in reply to telephone communications he had with Fibbe. Fibbe explained that a survey conducted on May 25 showed that construction consisted of having pilings in place with some of the joists in place, which did not meet the requirements necessary to allow installation of a septic tank. The letter also stated:
“I will be glad to discuss with you alternate sewage disposal systems or other aspects of this program.”
On May 31,1976, McNeill received a reply from Dr. Newburn, which read as follows:
“I am sorry to inform you that I cannot give you permission to install a septic tank on the properties you refer to on Dauphin Island (G. E. McNeill and A. L. Dees).
“Appeal must be made directly to the six-member Board of Health. The current Chairman of the Board is Dr. O. M. Otts, Jr., and I do not know at this time what the Board might say with regard to any appeal.
“If the Board elects to continue the moratorium on septic tanks, I feel sure that they will direct us to consider alternate non-discharging systems.”
On July 9, 1976, McNeill received a standard form letter from Fibbe as a follow-up to a May 20, 1976, public hearing on the sewage problem. Attached to the letter was a resolution signed June 14, 1976, by the Chairman of the Mobile County Board of Health, Dr. O. M. Otts, Jr., stating that no new septic tanks, ground absorption sewage disposal systems shall be permitted. After the July 9 letter, McNeill did not see any purpose to be served in appealing to the Board.
Between the end of May and September 14, 1976, when this suit was filed, McNeill contends he attempted through discussions with Fibbe or Mr. David Kingston, another staff member, to obtain approval for an alternative disposal system suggested either a “gray water” system[2] or a holding tank, *306 but never received an answer. In the hearing on October 1, 1976, McNeill explained his position as follows:
“A. Yes, sir, I hadn’t heard from the Board of Health on that separate system I asked them about. I was having materials stolen constantly from down there. We had stopped, almost completely, construction on the houses because, you know, the sun warping materials, decking coming up. We are replacing the decking on the front porch to Mr. Dees’ house now. Mine is all warped and separated and coming up. We had a lot of stuff stolen down there and even had a fire on Mr. Dees’ house. We don’t know where it come from. The Dauphin Island Fire Department put it out, them and the neighbors next door. We had no idea how it started. There were kids coming up from the beach at night and using them like they want to and I had $5,100 worth of those windows that they had finally got made. I had a notice that they were being shipped and I knew they would be sitting down there in the wide open space, because I couldn’t put them in or didn’t want to put them in until I knew I was going to be able to finish the house, so when I got a notice they were coming in and everything else combined, that was when I come to you.
“Q. All right, and was it a concern to you, at that time, that the Board of Health not come forth on any alternate suggestions that you had made?
“A. Yes sir.”
On September 14, 1976, McNeill requested and received a temporary restraining order enjoining the Board from preventing him from installing the septic tanks. No prior notice of the request was given to the Board, though a copy of the complaint was served on the Board that day. A hearing was set for September 24,10 days later, and later continued until October 1,1976. During this time McNeill installed both septic tanks.
County Boards of Health are authorized by Tit. 33, § 4, Code of Alabama 1940, Recompiled 1958. County Boards have the authority to adopt and promulgate rules and regulations for administering the health laws of the state. The rules and regulations have the force and effect of law. Tit. 22, § 8. Tit. 22, § 140(13) to § 140(18) provides specific authority to county boards of health oyer sewage disposal systems:
“It shall be unlawful and shall constitute a misdemeanor to build an insanitary sewage collection, treatment and disposal facility ... including . . . septic tank systems . . . .” Tit. 22, § 140(13).
“The state board of health and/or county boards of health . . . shall require every person ... to install the required plumbing facilities, type and number of sewage collection, treatment and disposal facilities conforming to rules and regulations of the state board of health and/or county boards of health . . . .” Tit. 22, § 140(14).
“All plans and specifications applying to sewage collection, treatment and disposal shall be first submitted to the state board of health and/or county boards of health for approval before construction. ...” Tit. 22, § 140(16).
“The issuance of permits for the installation of plumbing . . . shall be in conformance with the rules and regulations of the state board of health and/or county boards of health . . . .” Tit. 22, § 140(18).
Violations are misdemeanors punishable by fine. Tit. 22, §§ 140(15), 140(16).
Appellants question whether McNeill exhausted his administrative remedies, as he did not request a hearing before the Mobile County Board of Health. Although we find no statutory scheme for a hearing or appeal to a county board of health, we believe a decision in this matter should be first decided by the County Board of Health under the theory of primary jurisdiction or prior resort.
“One of the aims of the doctrine is to insure uniformity and consistency in dealing with matters entrusted to an administrative body. Texas & Pacific Railroad *307 Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553. Another factor which must be considered is whether referral to an agency is preferable because of its specialized knowledge or expertise in dealing with the matter in controversy. Far East Conference v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576. See also United States v. Western Pacific Railroad Co., supra [352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126]; United States Navigation Co. v. Cunard Steamship Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408. Still another is whether initial review of the controversy by the administrative body will either assist a court in its adjudicatory function or perhaps alleviate entirely the need for resort to judicial relief. Chicago Mercantile Exchange v. Deaktor, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344; Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525, reh. denied, 410 U.S. 960, 93 S.Ct. 1411, 35 L.Ed.2d 697. This latter factor indicates it is preferable to obtain the views of the administrative body concerning the statutes or rules with which it must work and how those statutes or rules should be applied to the controversy at hand. See Miron, Primary Jurisdiction, 43 Antitrust L.J., S.B.A., Issue No. 2, p. 329.
“We hold today that when a court and an administrative agency have concurrent jurisdiction over a controversy, the court may decline judicial relief pending administrative review when the court finds that administrative review of the controversy will promote uniformity and consistency in the application of the pertinent statutes, rules and regulations; agency expertise is required, and initial agency review will materially assist the court upon later review. In stating this rule we use a conjunctive form of expression. This should not be taken as demanding that all of the determinative factors be present simultaneously. Where one or more of the factors are present it is for the court to weigh the need of initial agency review against the right and need of the parties to immediate judicial determination. In ruling on such questions, a trial court should make known those factors considered in deciding whether to decline immediate judicial relief or not.” Fraternal Ord. of Police, Strawberry L. #40 v. Entrekin, 294 Ala. 201, 210, 211, 314 So.2d 663, 671, 672.
The problems caused by septic tanks in a coarse, sandy soil under high water table conditions lies within the specialized knowledge and expertise of the Board of Health. Substantial research and investigation were completed before the decision was made to halt further installation of septic tanks. The Board gave prior notice of its intention followed by a public hearing on May 20, 1976. McNeill’s variance, expiring January 31, 1976, required the building to be well under construction. The residence was not well under construction at that time. For some reason not explained in the record, the prerequisite was thereafter changed to require the plumbing to be first roughed in. Perhaps this was intended as a more specific definition of “well under construction.”
We can well understand the dilemma McNeill found himself in. Moreover, we are aware of the presumption of correctness in the trial court’s decision. Valley Heating, etc. v. Alabama Gas Corp., 286 Ala. 79, 237 So.2d 470 (1970). However, we find nothing arbitrary in the manner in which the Board stopped McNeill from installing his septic tanks.
Quite likely McNeill was not the only one injured by the moratorium. We would like to know the intentions of the Board. McNeill, according to his testimony, suggested alternatives to the staff member of the Board (without reply), but never went directly to the Board.
McNeill contends an appeal to the Board would be a useless act. We are not permitted to indulge such a presumption. Moreover, the Board may approve alternative systems of sewage disposal. We hope a decision by the Board will alleviate the need for judicial relief.
The judgment in this cause is reversed and the cause is remanded to the circuit *308 court which shall retain jurisdiction pending McNeill’s appeal to the Mobile County Board of Health. We pretermit consideration of the other issues raised.
REVERSED AND REMANDED WITH DIRECTIONS.
TORBERT, C. J., and BLOODWORTH, JONES and EMBRY, JJ., concur.

. The plaintiffs-appellees include Mr. G. E. McNeill’s neighbor, A. Lamont Dees. The situation as to Mr. Dees is substantially the same as McNeill’s.

. In a gray water system, as McNeill describes it, the septic tank is not connected to the filter field. Water not containing sewage goes to the filter field while water containing sewage goes to the septic tank, which is periodically pumped out.