**Patricia HURLEY, Plaintiff,**

v.

**AMOCO OIL COMPANY, Defendant.**

**No. 78 C 384.**

United States District Court,
E. D. New York.

Aug. 16, 1979.

dence prior to the third trial.  *See* 18 U.S.C. § 3731.

Carl L. Levine, New York City, for plaintiff.

Townley & Updike, New York City, by Richard R. Lutz, New York City, for defendant.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

This private treble damage action is brought pursuant to Section 210 of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904 Note ("ESA"), and Section 5(a) of the Emergency Petroleum Allocation Act of 1973, as amended, 15 U.S.C. § 754(a) ("EPPAA"). According to the allegations of the two-count complaint, in August 1973 the defendant ("Amoco"), in violation of the regulations promulgated under both the ESA and the EPPAA, reduced or discontinued certain gasoline price allowances which had been in effect on May 15 of that year, thereby causing plaintiff, a gasoline retailer, to pay an excessive price for the gasoline she purchased from Amoco over a three-year period. The action is now before the court on Amoco's motion for an order staying further proceedings pending the outcome of a related matter before the United States Department of Energy ("DOE"). For the reasons which follow, the motion is granted.

Until his death in April 1973, Francis J. Hurley owned and operated a gasoline service station in Commack, New York, known as "Gasoline Heaven." On April 14, 1969, Hurley entered into two agreements with Amoco. The first, a so-called "dealer's agreement," obliged Amoco to supply Gasoline Heaven's monthly gasoline requirements, apparently at prevailing "tank wagon" prices less a $.02 per gallon end-of-month allowance ("EOM"), until a total of 10 million gallons had been supplied. The second agreement, an "amortization letter," provided for a $30,950.00 contribution by Amoco to Gasoline Heaven for real estate improvement and equipment installation, to be "amortized" at the rate of $.0031 per gallon sold by Gasoline Heaven until the 10 million gallon mark had been reached. When Hurley died, his wife, Patricia Hurley, the plaintiff in this action, became the owner and operator of Gasoline Heaven.

On April 25, 1973, plaintiff, at Amoco's behest, entered into a new dealer's agreement for the period April 19, 1973 to August 31, 1973 (her husband had passed away on April 18), which provided for an EOM of $.01 rather than $.02 per gallon, despite the fact that the volumetric limit of the 1969 agreements had not been reached. Thereafter, she entered into a three-year dealer agreement with Amoco, apparently embodying similar terms (i. e., a $.01 EOM), to commence September 1, 1973. See Hurley Aff. (6/13/78), Exhibit A.

Notwithstanding the terms of the April 25 agreement, Amoco continued to pay Mrs. Hurley a $.02 per gallon EOM through the beginning of August 1973, which was, coincidentally, the month during which Gasoline Heaven purchased its ten-millionth gallon under the 1969 agreements. August also marked the promulgation of the Cost of Living Council's "Phase IV" petroleum products pricing rules, which, subject to certain adjustments, prohibited refiners from charging for a "covered product"—such as gasoline—sold "to any class of purchaser a price in excess of the base price," 6 C.F.R. § 150.355(b) (1974), defined as "the average weighted price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus (A) increased product costs incurred between the month of measurement and the month of May 1973 and measured pursuant to the provisions of § 150.356, and (B) the refiner incentive factor calculated and permitted pursuant to the provisions of § 150.-357," id. at § 150.355(g).

In 1974, the Federal Energy Administration ("FEA") promulgated its own "General Allocation and Price Rules" and "Mandatory Petroleum Price Regulations," codified in

10 C.F.R. Parts 210 and 212, respectively, and assumed responsibility for enforcing the Cost of Living Council's Phase IV petroleum pricing rules. Accordingly, it was to the FEA that plaintiff wrote on November 18, 1974, complaining that Amoco's $.01 per gallon reduction in the EOM she received for gasoline purchased for resale by Gasoline Heaven was inconsistent with federal pricing regulations. See Hurley Aff. (filed 6/13/78), Exhibit A.

Nearly a year after receiving plaintiff's letter, and following some form of investigation, the FEA took the first step in commencing formal enforcement or compliance proceedings by issuing a Standard Oil Company (Indiana) ("Standard"), Amoco's parent company, a Notice of Probable Violation ("NOPV"), see 10 C.F.R. §§ 205.190–205.195, in which it alleged that Amoco had violated 6 C.F.R. §§ 150.20, 150.355 and 10 C.F.R. §§ 210.62, 212.82 by modifying or failing "to renew certain lease-leasebacks and end of month allowances with Amoco-branded independent motor gasoline retail dealers who either own their locations or have leasehold interests therein derived from parties other than Amoco." NOPV (11/11/75), at 2–3. Standard has filed with FEA and its successor agency, the DOE, several "replies" challenging the allegations of the NOPV, the most recent on February 10, 1978. See Lethem Aff. (filed 5/25/78), Exhibit D.

THE NOPV was still outstanding on March 1, 1978, when plaintiff filed her two-count complaint. Indeed, it remains so today.

*The Complaint*

Plaintiff's first claim is that the $.02 EOM, which was in effect on May 15, 1973, constituted a rebate or other price allowance which could not be discontinued by Amoco under the provisions of 10 C.F.R. Part 212, Subpart E. Accordingly, she seeks an award of three times her actual

damages of $85,484.08, representing $.01 for every gallon of gasoline Gasoline Heaven purchased from Amoco after it reached the volumetric limit of the 1969 agreements [1] and until August 31, 1976. Her second claim is that Amoco was required by 10 C.F.R. § 210.62 and Part 212, Subpart E, to continue through August 31, 1976, the amortization agreement which was in effect on May 15, 1973 and which by its terms expired when Gasoline Heaven sold its ten-millionth gallon in August of that year. To redress the loss she sustained as a result of this violation, she seeks an award of treble damages totalling $79,500.18.

Amoco does not suggest that plaintiff was required to exhaust administrative remedies before seeking judicial relief. It does, however, argue that the court should temporarily stay its hand so that it may have the benefit of the DOE's resolution of those issues which are common to this action and the DOE proceeding and which fall within the purview of the agency's particular expertise.

The rationale underlying the concept the defendant invokes, the doctrine of primary jurisdiction, was most succinctly stated in *Far East Conference v. United States,* 342 U.S. 570, 574–75, 72 S.Ct. 492, 494, 96 L.Ed. 576:

"[I]n cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances

---

1. Although Amoco on June 28, 1973, advised Mrs. Hurley that the $.02 EOM would be reduced to $.01 on August 1, 1973, and apparently was true to its word, in response to her protests it later reimbursed her an amount equal to the withheld portion of the EOM through the volumetric conclusion of the 1969 dealer's agreement. See Hurley Aff. (6/13/78), Exh. A at 3.

underlying the legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

See *MCI Communications Corp. v. American Telephone & Telegraph Co.*, 496 F.2d 214, 220 (3d Cir. 1974). From this, Judge Tenney has recently formulated a tetrapartite test for determining whether a district court should in the first instance defer to agency expertise: (1) Does resolution of the issue require the exercise of ordinary judicial expertise? (2) Does the controversy involve matters within the agency's peculiar discretion? (3) Is there a danger of inconsistent judicial and administrative rulings? and (4) Has the remedial power of the agency been invoked? See *Orange & Rockland Utilities, Inc. v. Howard Oil Co.*, 416 F.Supp. 460, 466 (S.D.N.Y.1976).

The brevity of the complaint belies the complexity of the issues it raises. In support of her first claim, for example, plaintiff alleges that federal "regulations require[d] the continuation of rebates and other price allowances in effect on May 15, 1973." Complaint at ¶ 14. The regulations are, however, far less categorical. Thus, while 10 C.F.R. § 210.62(c) straightforwardly forbids "[a]ny practice which constitutes a means to obtain a price higher than is permitted by the [pricing] regulations . . . or to impose terms or conditions not customarily imposed upon the sale of an allocated product," a determination of permissible price requires a more global inquiry. The successor to 6 C.F.R. § 150.355(b) provides, subject to certain exceptions, that "[a] refiner may not charge to any class of purchaser a price for a covered product in excess of the base price of that covered product." 10 C.F.R. § 212.82(a). Base price, in turn, is defined primarily as "the weighted average price at which the item was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus increased product costs incurred between the month of measurement and the month of May 1973 . . . ." *Id.* subd. (b)(1). Under the regulations, " 'Class of Purchaser' means purchasers or lessees to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers or lessees and other purchasers or lessees." *Id.* § 212.31. Finally, the last cited regulation provides that " '[C]ustomary price differential' includes a price distinction based on a discount, allowance, add-on, premium, and an extra based on a difference in volume, grade, quality, or location or type of purchaser, or a term or condition of sale or delivery."

Accordingly, the real issue raised by plaintiff's first claim is whether she and other dealer-owners who received EOM allowances constituted a class of purchasers—distinct from other Amoco dealers—entitled to pay a lower net price for gasoline.[2] The answer depends, of course, on whether an EOM is a price discount or allowance and, if so, whether as between Amoco and Amoco dealers on May 15, 1973, it constituted a customary price differential offered to certain purchasers but not others.[3] While a

**2.** The FEA went still further than plaintiff, indicating that Amoco's different economic treatment of dealer-owners and other dealers—the former, prior to the industry dislocation that occurred in mid–1973, paid consistently lower prices for gasoline (or, in any event, incurred smaller total financial obligations to Amoco) than did non-owners, see note 3, *infra*—constituted a "customary business practice," modification of which was proscribed by 10 C.F.R. § 210.62(a). See NOPV, Lethem Aff. (filed 5/25/78), Exh. A at 9.

**3.** The FEA in the Standard NOPV took the position that the EOM's extended by Amoco to its dealer-owners represented a pass-back of the savings Amoco realized by avoiding the costs of station ownership and maintenance. From this, the FEA reasoned that the EOM's were cost-justified customary price differentials (price differentials because dealers who purchase product from Amoco under EOM agreements incur smaller per-gallon financial obligations to Amoco than do non-owner-dealers) attributable to differences in the type of purchaser and the terms of sale, so that Amoco was obliged under the regulations to establish a separate class of purchaser composed of dealer-owners (including those who participate in so-called "lease-leaseback arrangements"), for whom base price calculations separate from

court can hardly be heard to disclaim the ability to interpret and apply administrative regulations, particularly where Congress has expressly empowered it to do so, but compare *MCI Communications Corp.,* supra, 496 F.2d at 222, here the DOE's intensive familiarity with petroleum industry practice stands in stark contrast to the very limited experience of the court, and counsels strongly in favor of permitting the agency to make its determination first.

Perhaps more important, the agency has already conducted a preliminary investigation and has commenced formal compliance proceedings which bear on Amoco's potential liability to many hundreds of retailers. NOPV at 4. See *Orange & Rockland Utilities, Inc.,* supra, 416 F.Supp. at 466. If courts are reluctant to enter the regulatory fray in advance of the responsible agency, they are no more willing when issue has been joined before the agency. The more prudent course in such cases is to refrain, provided the party seeking judicial relief will not be unfairly prejudiced by the delay.

We do not understand plaintiff to claim specific prejudice should her judicial remedy be withheld pending the conclusion of the DOE proceeding. She does, however, offer three grounds in opposition to Amoco's application.

First, she claims that the second count of her complaint will be unaffected by DOE's decision. Even were she correct, a stay would still be mandated: "The test is not whether some parts of the case are within the exclusive jurisdiction of the courts; the test is whether some parts of the case are within the exclusive jurisdiction of the agency." 8 K. David, Administrative Law Treatise § 19.07 at 39 (1958). More important, where some aspect of the dispute lies within the agency's realm a stay is appropriate provided only that the agency's ruling will be of "material aid" in resolving the issues before the court. *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 302, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). We need only note that while the NOPV does not address the propriety of Amoco's discontinuance of completed amortization agreements—assuming, without deciding, that the substance of plaintiff's second claim is that the capital contribution made by Amoco to Gasoline Heaven constituted a normal business practice which Amoco was required to maintain without modification under 10 C.F.R. § 210.62(a)—Standard has itself introduced some aspect of the issue into the agency proceeding. See Lethem Aff., supra, Exhibit D at 26–27.

Second, plaintiff claims that her administrative remedies are inadequate. The short answer is that by staying this action we are not remitting plaintiff to her administrative remedies; rather, we are withholding judicial action so that we may have the benefit of the agency's handling of related issues before proceeding to judgment.[4]

Finally, plaintiff notes that the DOE is not obliged to resolve the dispute before it. While we think that plaintiff's concern is not without foundation, see 10 C.F.R. § 205.191(g), we are of the opinion that the benefits of administrative guidance far outweigh the risk that the DOE will ultimately rescind the NOPV which has been outstand-

---

those for other purchasers would be required. Standard, for its part, has maintained that its EOM's were unrelated to product costs (or savings) and should be treated as market-value based partial reimbursements of real estate costs, that is, "rents," which are beyond the reach of the EPAA. See Second Supplemental Reply to NOPV, Lethem Aff., supra, Exh. D, at 25–29. In the alternative, Standard has argued that even if the EOM's represented discounts in price, because they were originally extended in order to meet competition, they could not, under the FEA's Ruling 1975–2, CCH Energy Mgmt. ¶ 16,042, give rise to a separate class of purchaser and were properly withdrawn when

the competitive structure of the retail gasoline market profoundly changed in mid–1973. See Supplemental Reply to NOPV, Lethem Aff., supra, Exh. C, at 1–14.

4. Although the agency apparently lacks authority to award treble damages even for intentional violations, 10 C.F.R. § 205.194 provides that "[a] remedial order may require the person to whom it is directed . . . to refund amounts paid to such person that are in excess of the amount permitted under Part 212 [of Title 10, C.F.R.], or to take such other action as the FEA determines is necessary . . . to compensate for the effects of a violation."

ing since November 1975. Accordingly, defendant's application for a stay will be granted, with the proviso that plaintiff may move to vacate if no action is taken by the DOE within six months from the entry of an order on this decision.

Settle order on ten days' notice.

SO ORDERED.